(No. 85726.— )

WILLIAM PETROVICH, Adm'r of the Estate of Inga Petrovich, *et al.*, Appellees, v. SHARE HEALTH PLAN OF ILLINOIS, INC., Appellant.

*Opinion filed September 30, 1999.*

18

20

RATHJE, J., took no part.

Hinshaw & Culbertson, of Chicago (Peter A. Walsh, Joshua G. Vincent and Timothy G. Shelton, of counsel), for appellant.

Robert J. Napleton, of Motherway, Glenn & Napleton (Lynn D. Dowd, of counsel), all of Chicago, for appellees.

Thaddeus J. Nodzenski and Mark D. Deaton, of Naperville, for *amicus curiae* Illinois Hospital & HealthSystems Association.

Robert S. Baker, of Baker & Enright, of Chicago, for *amicus curiae* Metropolitan Chicago Healthcare Council.

Herbolsheimer, Lannon, Henson, Duncan & Reagan, P.C., of Ottawa (Michael T. Reagan, of counsel), for *amicus curiae* Illinois Association of Health Maintenance Organizations.

John L. Nisivaco, of Terrence J. Lavin & Associates, of Chicago, for *amicus curiae* Illinois Trial Lawyers Association.

Saul J. Morris and Robert John Kane, of Springfield, for *amicus curiae* Illinois State Medical Society.

JUSTICE BILANDIC delivered the opinion of the court:

The plaintiff brought this medical malpractice action against a physician and others for their alleged negligence in failing to diagnose her oral cancer in a timely manner. The plaintiff also named her health maintenance organization (HMO) as a defendant. The central issue here is whether the plaintiff's HMO may be held vicariously liable for the negligence of its independent-contractor physicians under agency law. The plaintiff contends that the HMO is vicariously liable under both the doctrines of apparent authority and implied authority.

The circuit court of Cook County awarded summary judgment in favor of the HMO, Share Health Plan of Illinois, Inc. (Share), and against the plaintiff, Inga Petrovich, as well as her husband and coplaintiff, Vukasin Petrovich. The circuit court held that Share cannot be held vicariously liable for the negligence of its physicians who are independent contractors. The plaintiffs appealed to the appellate court pursuant to Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)). The appellate court reversed and remanded for further proceedings. 296 Ill. App. 3d 849. We allowed Share's petition for leave to appeal (177 Ill. 2d R. 315) and now affirm the judgment of the appellate court. We hold that the plaintiff has presented sufficient evidence to entitle her to a trial on whether Share is vicariously liable under the doctrines of apparent and implied authority.

Four *amicus curiae* briefs were filed with the permission of this court. See 155 Ill. 2d R. 345. The Illinois Association of Health Maintenance Organizations filed a brief in support of Share. The Illinois Hospital & Healthsystems Association and the Metropolitan Chicago Healthcare Council filed a joint brief in support of Share.

The Illinois Trial Lawyers Association filed a brief in support of the plaintiff. The Illinois State Medical Society, a physicians group, also filed a brief in support of the plaintiff.

The plaintiff died during the pendency of this appeal. Substituted in her place as appellee is William Petrovich, the administrator of her estate. For ease of discussion, we refer to both the plaintiff and appellee as "plaintiff."

## FACTS

In 1989, plaintiff's employer, the Chicago Federation of Musicians, provided health care coverage to all of its employees by selecting Share and enrolling its employees therein. Share is an HMO and pays only for medical care that is obtained within its network of physicians. In order to qualify for benefits, a Share member must select from the network a primary care physician who will provide that member's overall care and authorize referrals when necessary. Share gives its members a list of participating physicians from which to choose. Share has about 500 primary care physicians covering Share's service area, which includes the counties of Cook, Du Page, Lake, McHenry and Will. Plaintiff selected Dr. Marie Kowalski from Share's list, and began seeing Dr. Kowalski as her primary care physician in August of 1989. Dr. Kowalski was employed at a satellite facility of Illinois Masonic Medical Center (Illinois Masonic), which had a contract with Share to provide medical services to Share members.

In September of 1990, plaintiff saw Dr. Kowalski because she was experiencing persistent pain in the right sides of her mouth, tongue, throat and face. Plaintiff also complained of a foul mucus in her mouth. Dr. Kowalski referred plaintiff to two other physicians who had contracts with Share: Dr. Slavick, a neurologist, and Dr. Friedman, an ear, nose and throat specialist.

Plaintiff informed Dr. Friedman of her pain. Dr. Friedman observed redness or marked erythema along-

side plaintiff's gums on the right side of her mouth. He recommended that plaintiff have a magnetic resonance imaging (MRI) test or a computed tomography (CT) scan performed on the base of her skull. According to plaintiff's testimony at her evidence deposition, Dr. Kowalski informed her that Share would not allow new tests as recommended by Dr. Friedman. Plaintiff did not consult with Share about the test refusals because she was not aware of Share's grievance procedure. Dr. Kowalski gave Dr. Friedman a copy of an old MRI test result at that time. The record offers no further information about this old MRI test.

Nonetheless, Dr. Kowalski later ordered an updated MRI of plaintiff's brain, which was performed on October 31, 1990. Inconsistent with Dr. Friedman's directions, however, this MRI failed to image the right base of the tongue area where redness existed. Plaintiff and Dr. Kowalski discussed the results of this MRI test on November 19, 1990, during a follow-up visit. Plaintiff testified that Dr. Kowalski told her that the MRI revealed no abnormality.

Plaintiff's pain persisted. In April or May of 1991, Dr. Kowalski again referred plaintiff to Dr. Friedman. This was plaintiff's third visit to Dr. Friedman. Dr. Friedman examined plaintiff and observed that plaintiff's tongue was tender. Also, plaintiff reported that she had a foul odor in her mouth and was experiencing discomfort. On June 7, 1991, Dr. Friedman performed multiple biopsies on the right side of the base of plaintiff's tongue and surrounding tissues. The biopsy results revealed squamous cell carcinoma, a cancer, in the base of plaintiff's tongue and the surrounding tissues of the pharynx. Later that month, Dr. Friedman operated on plaintiff to remove the cancer. He removed part of the base of plaintiff's tongue, and portions of her palate, pharynx and jaw bone. After the surgery, plaintiff underwent radiation treatments and rehabilitation.

Plaintiff subsequently brought this medical malpractice action against Share, Dr. Kowalski and others. Dr. Friedman was not named a party defendant. Plaintiff's complaint, though, alleges that both Drs. Kowalski and Friedman were negligent in failing to diagnose plaintiff's cancer in a timely manner, and that Share is vicariously liable for their negligence under agency principles. Share filed a motion for summary judgment, arguing that it cannot be held liable for the negligence of Dr. Kowalski or Friedman because they were acting as independent contractors in their treatment of plaintiff, not as Share's agents. Plaintiff countered that Share is not entitled to summary judgment because Drs. Kowalski and Friedman were Share's agents. The parties submitted various depositions, affidavits and exhibits in support of their respective positions.

Share is a for-profit corporation. At all relevant times, Share was organized as an "independent practice association-model" HMO under the Illinois Health Maintenance Organization Act (Ill. Rev. Stat. 1991, ch. 111½, par. 1401 *et seq.*). This means that Share is a financing entity that arranges and pays for health care by contracting with independent medical groups and practitioners. See Ill. Rev. Stat. 1991, ch. 111½, par. 1402(7). Share does not employ physicians directly, nor does it own, operate, maintain or supervise the offices where medical care is provided to its members. Rather, Share contracts with independent medical groups and physicians that have the facilities, equipment and professional skills necessary to render medical care. Physicians desiring to join Share's network are required to complete an application procedure and meet with Share's approval.

Share utilizes a method of compensation called "capitation" to pay its medical groups. Share also maintains a "quality assurance program." Share's capitation method of compensation and "quality assurance program" are more fully described later in this opinion.

Share provides a member handbook to each of its members, including plaintiff. The handbook states to its members that Share will provide "all your healthcare needs" and "comprehensive high quality services." The handbook also states that the primary care physician is "your health care manager" and "makes the decisions" about the member's care. The handbook further states that Share is a "good partner in sickness and in health." Unlike the master agreements and benefits contract discussed below, the member handbook which plaintiff received does not contain any provision that identifies Share physicians as independent contractors or nonemployees of Share. Rather, the handbook describes the physicians as "your Share physician," "Share physicians" and "our staff." Furthermore, Share refers to the physicians' offices as "Your Share physician's office" and states: "All of the Share staff and Medical Offices look forward to serving you ***."

Plaintiff confirmed that she received the member handbook. Plaintiff did not read the handbook in its entirety, but read portions of it as she needed the information. She relied on the information contained in the handbook while Drs. Kowalski and Friedman treated her.

The record also contains a "Health Care Services Master Agreement," entered into by Share and Illinois Masonic. Dr. Kowalski is a signatory of this agreement. The agreement states, "It is understood and agreed that [Illinois Masonic] and [primary care physicians] are independent contractors and not employees or agents of SHARE." A separate agreement between Share and Dr. Friedman contains similar language. Plaintiff did not receive these agreements.

Share's primary care physicians, under their agreements with Share, are required to approve patients' medical requests and make referrals to specialists. These physicians use Share's standard referral forms to indicate

their approval of the referral. Dr. Kowalski testified at an evidence deposition that she did not feel constrained by Share in making medical decisions regarding her patients, including whether to order tests or make referrals to specialists.

Another document in the record is Share's benefits contract. The benefits contract contains a subscriber certificate. The subscriber certificate sets forth a member's rights and obligations with respect to Share. Additionally, the subscriber certificate states that Share's physicians are independent contractors and that "SHARE Plan Providers and Enrolling Groups are not agents or employees of SHARE nor is SHARE or any employee of SHARE an agent or employee of SHARE Plan Providers or Enrolling Groups." The certificate elaborates: "The relationship between a SHARE Plan Provider and any Member is that of provider and patient. The SHARE Plan Physician is solely responsible for the medical services provided to any Member. The SHARE Plan Hospital is solely responsible for the Hospital services provided to any Member."

Plaintiff testified that she did not recall receiving the subscriber certificate. In response, Share stated that Share customarily provides members with this information. Share does not claim to know whether Share actually provided plaintiff with this information. Plaintiff acknowledged that she received a "whole stack" of information from Share upon her enrollment.

Plaintiff was not aware of the type of relationship that her physicians had with Share. At the time she received treatment, plaintiff believed that her physicians were employees of Share.

In the circuit court, Share argued that it was entitled to summary judgment because the independent-contractor provision in the benefits contract established, as a matter of law, that Drs. Kowalski and Friedman

were not acting as Share's agents in their treatment of plaintiff. The circuit court agreed and entered summary judgment for Share.

The appellate court reversed, holding that a genuine issue of material fact is presented as to whether plaintiff's treating physicians are Share's apparent agents. 296 Ill. App. 3d 849. The appellate court stated that a number of factors support plaintiff's apparent agency claim, including plaintiff's testimony, Share's member handbook, Share's quality assessment program and Share's capitation method of compensation. The appellate court therefore remanded the cause for trial. The appellate court did not address the theory of implied authority.

## ANALYSIS

This appeal comes before us amidst great changes to the relationships among physicians, patients and those entities paying for medical care. Traditionally, physicians treated patients on demand, while insurers merely paid the physicians their fee for the services provided. Today, managed care organizations (MCOs) have stepped into the insurer's shoes, and often attempt to reduce the price and quantity of health care services provided to patients through a system of health care cost containment. MCOs may, for example, use prearranged fee structures for compensating physicians. MCOs may also use utilization-review procedures, which are procedures designed to determine whether the use and volume of particular health care services are appropriate. MCOs have developed in response to rapid increases in health care costs.

HMOs, *i.e.*, health maintenance organizations, are a type of MCO. HMOs are subject to both state and federal laws. See generally 215 ILCS 125/1—1 *et seq.* (West 1998) (containing the Illinois Health Maintenance Organization Act); 42 U.S.C. § 300e *et seq.* (West 1994 & Supp. 1997) (containing the federal Health Maintenance Organization Act of 1973). Under Illinois law, an HMO is

defined as "any organization formed under the laws of this or another state to provide or arrange for one or more health care plans under a system which causes any part of the risk of health care delivery to be borne by the organization or its providers." Ill. Rev. Stat. 1991, ch. 111½, par. 1402(9), now 215 ILCS 125/1—2(9) (West 1998). Because HMOs may differ in their structures and the cost-containment practices that they employ, a court must discern the nature of the organization before it, where relevant to the issues. As earlier noted, Share is organized as an independent practice association (IPA)-model HMO. IPA-model HMOs are financing entities that arrange and pay for health care by contracting with independent medical groups and practitioners. See 215 ILCS 125/1—2(7) (West 1998).

This court has never addressed a question of whether an HMO may be held liable for medical malpractice. Share asserts that holding HMOs liable for medical malpractice will cause health care costs to increase and make health care inaccessible to large numbers of people. Share suggests that, with this consideration in mind, this court should impose only narrow, or limited, forms of liability on HMOs. We disagree with Share that the cost-containment role of HMOs entitles them to special consideration. The principle that organizations are accountable for their tortious actions and those of their agents is fundamental to our justice system. There is no exception to this principle for HMOs. Moreover, HMO accountability is essential to counterbalance the HMO goal of cost-containment. To the extent that HMOs are profit-making entities, accountability is also needed to counterbalance the inherent drive to achieve a large and ever-increasing profit margin. Market forces alone "are insufficient to cure the deleterious [e]ffects of managed care on the health care industry." *Herdrich v. Pegram*, 154 F.3d 362, 374-75 (7th Cir. 1998), *cert. granted*, No.

98—1949 (U.S. September 28, 1999). Courts, therefore, should not be hesitant to apply well-settled legal theories of liability to HMOs where the facts so warrant and where justice so requires.

Indeed, the national trend of courts is to hold HMOs accountable for medical malpractice under a variety of legal theories, including vicarious liability on the basis of apparent authority, vicarious liability on the basis of *respondeat superior*, direct corporate negligence, breach of contract and breach of warranty. See generally Annotation, *Liability of Health Maintenance Organizations (HMOs) for Negligence of Member Physicians*, 51 A.L.R.5th 271 (1997) (collecting cases); D. DiCicco, *HMO Liability for the Medical Negligence of Member Physicians*, 43 Vill. L. Rev. 499 (1998) (discussing trend). Our appellate court has also expressed the view that HMOs are subject to liability under the five legal theories listed above. *Raglin v. HMO Illinois, Inc.*, 230 Ill. App. 3d 642, 646 (1992). Share concedes that HMOs may be held liable for medical malpractice under these five theories.

This appeal concerns whether Share may be held vicariously liable under agency law for the negligence of its independent-contractor physicians. We must determine whether Share was properly awarded summary judgment on the ground that Drs. Kowalski and Friedman were not acting as Share's agents in their treatment of plaintiff. Plaintiff argues that Share is not entitled to summary judgment on this record. Plaintiff asserts that genuine issues of material fact exist as to whether Drs. Kowalski and Friedman were acting within Share's apparent authority, implied authority or both.

We conduct *de novo* review of the summary judgment granted to Share. See *Busch v. Graphic Color Corp.*, 169 Ill. 2d 325, 333 (1996). Summary judgment is proper where the pleadings, depositions, admissions, affidavits and exhibits on file, when viewed in the light most favor-

able to the nonmoving party, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Busch*, 169 Ill. 2d at 333. A triable issue of fact exists where there is a dispute as to a material fact or where, although the facts are not in dispute, reasonable minds might differ in drawing inferences from those facts. Although summary judgment is an expeditious method of disposing of a lawsuit, it is a drastic remedy and should be allowed only when the right of the moving party is free and clear from doubt. *Colvin v. Hobart Brothers*, 156 Ill. 2d 166, 169-70 (1993).

As a general rule, no vicarious liability exists for the actions of independent contractors. Vicarious liability may nevertheless be imposed for the actions of independent contractors where an agency relationship is established under either the doctrine of apparent authority (*Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 524 (1993)) or the doctrine of implied authority (see *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 163 (1989)).

## I. Apparent Authority

Apparent authority, also known as ostensible authority, has been a part of Illinois jurisprudence for more than 140 years. See Ill. L. & Prac. *Agency* § 112, at 734 (1953), citing *Doan v. Duncan*, 17 Ill. 272 (1855). Under the doctrine, a principal will be bound not only by the authority that it actually gives to another, but also by the authority that it appears to give. *Gilbert*, 156 Ill. 2d at 523. The doctrine functions like an estoppel. *O'Banner v. McDonald's Corp.*, 173 Ill. 2d 208, 213 (1996). Where the principal creates the appearance of authority, a court will not hear the principal's denials of agency to the prejudice of an innocent third party, who has been led to reasonably rely upon the agency and is harmed as a result. *O'Banner*, 173 Ill. 2d at 213; *Gilbert*, 156 Ill. 2d at 524.

This court first applied the apparent authority doctrine in a medical malpractice context in *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511 (1993). In *Gilbert*, a patient suffered a heart attack after being treated and released by a physician at a hospital emergency room. The patient brought an action against the hospital, charging that the hospital was vicariously liable for the physician's negligence in failing to diagnose the patient's heart problem. The trial court awarded summary judgment to the hospital, holding that the hospital could not be held vicariously liable because the emergency room physician was an independent contractor. This court reversed. We held that a genuine issue of material fact existed as to whether the physician was acting as the hospital's apparent agent. *Gilbert*, 156 Ill. 2d 511.

The *Gilbert* decision was grounded in "two realities of modern hospital care." *Gilbert*, 156 Ill. 2d at 520. First, hospitals, in essence, have become " 'big business.' " *Gilbert*, 156 Ill. 2d at 520, quoting *Kashishian v. Port*, 167 Wis. 2d 24, 38, 481 N.W.2d 277, 282 (1992). Hospitals increasingly hold themselves out to the public as the providers of health care, particularly in their marketing. Hospitals also benefit financially from the health care delivered in their emergency rooms. *Gilbert*, 156 Ill. 2d at 520-21. Second, the reasonable expectations of the public have changed. Patients have come to rely on the reputation of the hospital in seeking out emergency care. These patients would naturally assume that the physicians attending the emergency room are employees of the hospital, unless put on notice otherwise. Consequently, *Gilbert* held that, unless the patient knows or should have known that the physician providing treatment is an independent contractor, vicarious liability can attach to a hospital for the medical malpractice of its physicians under the apparent authority doctrine. *Gilbert*, 156 Ill. 2d at 524.

*Gilbert* sets forth and explains the elements necessary to prove apparent agency against a hospital. These elements are a "holding out" by the hospital and "justifiable reliance" by the plaintiff. *Gilbert*, 156 Ill. 2d at 525.

Joint *amici* the Illinois Hospital & Healthsystems Association and the Metropolitan Chicago Healthcare Council suggest that *Gilbert* should be overruled because it is unfair to hospitals. We are not persuaded by *amici*'s argument. *Gilbert* fairly imposes vicarious liability upon hospitals under the same doctrine of apparent authority that applies to other principals. We therefore reaffirm *Gilbert*.

We now hold that the apparent authority doctrine may also be used to impose vicarious liability on HMOs. Even before *Gilbert* was decided, our appellate court in *Raglin v. HMO Illinois, Inc.*, 230 Ill. App. 3d 642 (1992), expressed the view that the apparent authority doctrine applies to HMOs. *Raglin*, 230 Ill. App. 3d at 646. Since *Gilbert*, our appellate court in the instant case and in *Jones v. Chicago HMO Ltd.*, 301 Ill. App. 3d 103 (1998), *appeal allowed*, 183 Ill. 2d 569 (1999), held that the apparent authority doctrine as espoused in *Gilbert* applies to HMOs. 296 Ill. App. 3d at 855, 860-61; *Jones*, 301 Ill. App. 3d at 113. Courts in other jurisdictions have likewise concluded that HMOs are subject to this form of vicarious liability. *Boyd v. Albert Einstein Medical Center*, 377 Pa. Super. 609, 547 A.2d 1229 (1988); *Chase v. Independent Practice Ass'n*, 31 Mass. App. 661, 583 N.E.2d 251 (1991). Both Share and its *amicus* the Illinois Association of HMOs concede that apparent agency principles apply to HMOs.

To establish apparent authority against an HMO for physician malpractice, the patient must prove (1) that the HMO held itself out as the provider of health care, without informing the patient that the care is given by

independent contractors, and (2) that the patient justifiably relied upon the conduct of the HMO by looking to the HMO to provide health care services, rather than to a specific physician. Apparent agency is a question of fact. *Gilbert*, 156 Ill. 2d at 524.

### A. *Holding Out*

The element of "holding out" means that the HMO, or its agent, acted in a manner that would lead a reasonable person to conclude that the physician who was alleged to be negligent was an agent or employee of the HMO. See *Gilbert*, 156 Ill. 2d at 525, quoting *Pamperin v. Trinity Memorial Hospital*, 144 Wis. 2d 188, 207-08, 423 N.W.2d 848, 855-56 (1988). Where the acts of the agent create the appearance of authority, a plaintiff must also prove that the HMO had knowledge of and acquiesced in those acts. See *Gilbert*, 156 Ill. 2d at 525, quoting *Pamperin*, 144 Wis. 2d at 207-08, 423 N.W.2d at 855-56. Significantly, the holding-out element does not require the HMO to make an express representation that the physician alleged to be negligent is its agent or employee. Rather, this element is met where the HMO holds itself out as the provider of health care without informing the patient that the care is given by independent contractors. See *Gilbert*, 156 Ill. 2d at 525 (determining, in the context of the hospital emergency room, that the holding-out element is met where the hospital holds itself out as the "provider of emergency room care" without informing the patient that the care is given by independent contractors). Vicarious liability under the apparent authority doctrine will not attach, however, if the patient knew or should have known that the physician providing treatment is an independent contractor. See *Gilbert*, 156 Ill. 2d at 522, 524.

Here, Share contends that the independent-contractor provisions in the two master agreements and the benefits contract conclusively establish, as a matter

of law, that Share did not hold out Drs. Kowalski and Friedman to be Share's agents. Although all three of these contracts clearly express that the physicians are independent contractors and not agents of Share, we disagree with Share's contention for the reasons explained below.

First, the two master agreements at issue are private contractual agreements between Share and Illinois Masonic, with Dr. Kowalski as a signatory, and between Share and Dr. Friedman. The record contains no indication that plaintiff knew or should have known of these private contractual agreements between Share and its physicians. *Gilbert* expressly rejected the notion that such private contractual agreements can control a claim of apparent agency. *Gilbert*, 156 Ill. 2d at 521. As explained there, " '[A]ppearances speak much louder than the words of whatever private contractual arrangements the physicians and the hospital may have entered into, unbeknownst to the public, in an attempt to insulate the hospital from liability for the negligence, if any, of the physicians.' " *Gilbert*, 156 Ill. 2d at 521, quoting *Brown v. Coastal Emergency Services, Inc.*, 181 Ga. App. 893, 898, 354 S.E.2d 632, 637 (1987), *aff'd*, 257 Ga. 507, 361 S.E.2d 164 (1987). We hold that this same rationale applies to private contractual agreements between physicians and an HMO. See also 2A C.J.S. *Agency* § 165, at 805 (1972) (noting the general rule that apparent authority is not affected by private instructions or limitations). Because there is no dispute that the master agreements at bar were unknown to plaintiff, they cannot be used to defeat her apparent agency claim.

Share also relies on the benefits contract. Plaintiff was not a party or a signatory to this contract. The benefits contract contains a subscriber certificate, which states that Share physicians are independent contractors. Share claims that this language alone conclusively

overcomes plaintiff's apparent agency claim. We do not agree.

Whether a person has notice of a physician's status as an independent contractor, or is put on notice by the circumstances, is a question of fact. See *Gilbert*, 156 Ill. 2d at 524. In this case, plaintiff testified at her evidence deposition that she did not recall receiving the subscriber certificate. Share responded only that it customarily provides members with this information. Share has never claimed to know whether Share actually provided plaintiff with this information. Thus, a question of fact exists as to whether Share gave this information to plaintiff. If this information was not provided to plaintiff, it cannot be used to defeat her apparent agency claim.

Share nonetheless maintains that plaintiff's testimony that she received a "whole stack" of information from Share upon her enrollment proves that plaintiff received the subscriber certificate. Share is not entitled to summary judgment on the basis of this testimony. Even if Share did send this single disclaimer of an agency relationship to plaintiff within a "whole stack" of information, this fact would not conclusively resolve plaintiff's claim. As we discuss below, the record contains evidence that Share held itself out as the provider of health care without informing plaintiff that the care was given by independent contractors. A trier of fact must therefore be permitted to weigh the conflicting evidence and decide this issue based on the totality of the circumstances. Only a trier of fact can properly determine whether plaintiff had notice of the physicians' status as independent contractors, or was put on notice by the circumstances.

Evidence in the record supports plaintiff's contentions that Share held itself out to its members as the provider of health care, and that plaintiff was not aware that her physicians were independent contractors. Nota-

bly, plaintiff stated that, at the time that she received treatment, plaintiff believed that Drs. Kowalski and Friedman were Share employees. Plaintiff was not aware of the type of relationship that her physicians had with Share.

Moreover, Share's member handbook contains evidence that Share held itself out to plaintiff as the provider of her health care. The handbook stated to Share members that Share will provide "all your health-care needs" and "comprehensive high quality services." The handbook did not contain any provision that identified Share physicians as independent contractors or non-employees of Share. Instead, the handbook referred to the physicians as "your Share physician," "Share physicians" and "our staff." Share also referred to the physicians' offices as "Your Share physician's office." The record shows that Share provided this handbook to each of its enrolled members, including plaintiff. Representations made in the handbook are thus directly attributable to Share and were intended by Share to be communicated to its members.

Share argues that plaintiff is not entitled to rely on any statements made in the member handbook because, according to Share, plaintiff admitted that she never read that handbook. Share contends that plaintiff cannot justifiably rely on something of which she was not even aware. Share misrepresents plaintiff's testimony. Although plaintiff admitted that she did not read the member handbook from cover to cover, she testified that she read portions of the handbook as she needed the information. Plaintiff also stated that she relied on the information contained in the handbook while Drs. Kowalski and Friedman treated her, and she believed those physicians to be employees of Share. Consequently, Share's contention fails.

We hold that the above testimony by plaintiff and

Share's member handbook support the conclusion that Share held itself out to plaintiff as the provider of her health care, without informing her that the care was actually provided by independent contractors. Therefore, a triable issue of fact exists as to the holding-out element. We need not resolve whether any other evidence in the record also supports plaintiff's claim. Our task here is to review whether Share is entitled to summary judgment on this element. We hold that Share is not.

### B. *Justifiable Reliance*

A plaintiff must also prove the element of "justifiable reliance" to establish apparent authority against an HMO for physician malpractice. This means that the plaintiff acted in reliance upon the conduct of the HMO or its agent, consistent with ordinary care and prudence. See *Gilbert*, 156 Ill. 2d at 525-26, quoting *Pamperin*, 144 Wis. 2d at 211-12, 423 N.W.2d at 857.

The element of justifiable reliance is met where the plaintiff relies upon the HMO to provide health care services, and does not rely upon a specific physician. This element is not met if the plaintiff selects his or her own personal physician and merely looks to the HMO as a conduit through which the plaintiff receives medical care. See *Gilbert*, 156 Ill. 2d at 525.

Concerning the element of justifiable reliance in the hospital context, *Gilbert* explained that the critical distinction is whether the plaintiff sought care from the hospital itself or from a personal physician.

" 'Except for one who seeks care from a specific physician, if a person voluntarily enters a hospital without objecting to his or her admission to the hospital, then that person is seeking care from the hospital itself. An individual who seeks care from a hospital itself, as opposed to care from his or her personal physician, accepts care from the hospital in reliance upon the fact that complete emergency room care *** will be provided by the hospital through its staff.' " *Gilbert*, 156 Ill. 2d at 525, quoting *Pamperin*, 144 Wis. 2d at 211-12, 423 N.W.2d at 857.

This rationale applies even more forcefully in the context of an HMO that restricts its members to the HMO's chosen physicians. Accordingly, unless a person seeks care from a personal physician, that person is seeking care from the HMO itself. A person who seeks care from the HMO itself accepts that care in reliance upon the HMO's holding itself out as the provider of care.

Share maintains that plaintiff cannot establish the justifiable reliance element because she did not select Share. Share argues that, unless the plaintiff actually selects the HMO, there is no reliance upon the HMO and thus no nexus between the HMO's alleged wrongful conduct and the plaintiff's injury. Share takes the position that, if a person did not select the HMO, then that person can never claim apparent agency, regardless of what the HMO does, says or leads the person to believe.

We reject Share's argument. It is true that, where a person selects the HMO and does not rely upon a specific physician, then that person is relying upon the HMO to provide health care. This principle, derived directly from *Gilbert*, is set forth above. Equally true, however, is that where a person has no choice but to enroll with a single HMO and does not rely upon a specific physician, then that person is likewise relying upon the HMO to provide health care.

In the present case, the record discloses that plaintiff did not select Share. Plaintiff's employer selected Share for her. Plaintiff had no choice of health plans whatsoever. Once Share became plaintiff's health plan, Share required plaintiff to obtain her primary medical care from one of its primary care physicians. If plaintiff did not do so, Share did not cover plaintiff's medical costs. In accordance with Share's requirement, plaintiff selected Dr. Kowalski from a list of physicians that Share provided to her. Plaintiff had no prior relationship with Dr. Kowalski. As to Dr. Kowalski's selection of Dr. Friedman for

plaintiff, Share required Dr. Kowalski to make referrals only to physicians approved by Share. Plaintiff had no prior relationship with Dr. Friedman. We hold that these facts are sufficient to raise the reasonable inference that plaintiff relied upon Share to provide her health care services.

Were we to conclude that plaintiff was not relying upon Share for health care, we would be denying the true nature of the relationship among plaintiff, her HMO and the physicians. Share, like many HMOs, contracted with plaintiff's employer to become plaintiff's sole provider of health care, to the exclusion of all other providers. Share then restricted plaintiff to its chosen physicians. Under these facts, plaintiff's reliance on Share as the provider of her health care is shown not only to be compelling, but literally compelled. Plaintiff's reliance upon Share was inherent in Share's method of operation.

Share relies on certain language of the appellate decision in *Raglin* to support its position. The *Raglin* court, after noting that the HMO there required the plaintiff to select a physician from a limited list of physicians who contracted with the HMO, stated that this should not be dispositive as to the reliance question because "this is the manner in which all HMOs operate." *Raglin*, 230 Ill. App. 3d at 650. This language is of no assistance to Share. *Raglin* was decided before *Gilbert* and, thus, lacked the benefit of *Gilbert*'s analysis. We follow *Gilbert*, which clarified that the critical distinction as to the element of justifiable reliance is whether the plaintiff sought care from the health care entity itself or from a personal physician. To the extent that this language in *Raglin* may be construed as conflicting with our decision today, it is hereby overruled.

Share also attempts to analogize this case with *O'Banner v. McDonald's Corp.*, 173 Ill. 2d 208 (1996). In

*O'Banner*, the plaintiff slipped and fell in the bathroom of a restaurant owned by a franchisee and sought to impose liability on the franchisor under the doctrine of apparent authority. The trial court granted the franchisor's motion for summary judgment, and this court affirmed. This court held that the plaintiff must suffer summary judgment because the record was "devoid" of evidence regarding reliance. The plaintiff's pleadings and affidavit gave "no indication as to why he went to the restaurant in the first place." *O'Banner*, 173 Ill. 2d at 214.

According to Share, this case is like *O'Banner* because plaintiff here gave no indication as to why she chose Dr. Kowalski as her primary care physician. Share is mistaken. The record is replete with evidence explaining plaintiff's decisionmaking process regarding Dr. Kowalski. As outlined above, plaintiff was enrolled in Share's health plan by her employer. Plaintiff then selected Dr. Kowalski from a list of physicians that Share provided to her. Plaintiff had no prior relationship with Dr. Kowalski. She chose Dr. Kowalski because Share's health plan required her to obtain her primary medical care from one of its primary care physicians, if her care was to be covered. This case, therefore, is distinguishable from *O'Banner*.

In conclusion, as set forth above, plaintiff has presented sufficient evidence to support justifiable reliance, as well as a holding out by Share. Share, therefore, is not entitled to summary judgment against plaintiff's claim of apparent authority.

Share nonetheless contends that the appellate court erred in considering as evidence of apparent authority (1) Share's "quality assurance program" and (2) Share's capitation method of compensation, because both items were unknown to plaintiff. We need not address this argument. Our task here is to determine whether sum-

mary judgment was properly awarded to Share. Even if these items are removed from consideration, Share is not entitled to summary judgment. We therefore express no opinion regarding this issue.

## II. Implied Authority

Implied authority is actual authority, circumstantially proved. *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 163 (1989). One context in which implied authority arises is where the facts and circumstances show that the defendant exerted sufficient control over the alleged agent so as to negate that person's status as an independent contractor, at least with respect to third parties. See *John Gabel Manufacturing Co. v. Murphy*, 390 Ill. 455, 461 (1945); see generally 41 Am. Jur. 2d *Independent Contractors* §§ 9, 35, at 404-06, 434-36 (1995) (setting forth rule); 2A C.J.S. *Agency* § 155, at 783-84 (1972) (same). The cardinal consideration for determining the existence of implied authority is whether the alleged agent retains the right to control the manner of doing the work. See *John Gabel Manufacturing Co.*, 390 Ill. at 461. Where a person's status as an independent contractor is negated, liability may result under the doctrine of *respondeat superior*.

Plaintiff contends that the facts and circumstances of this case show that Share exerted sufficient control over Drs. Kowalski and Friedman so as to negate their status as independent contractors. Share responds that the act of providing medical care is peculiarly within a physician's domain because it requires the exercise of independent medical judgment. Share thus maintains that, because it cannot control a physician's exercise of medical judgment, it cannot be subject to vicarious liability under the doctrine of implied authority.

*Amicus* Illinois State Medical Society (Society), the physicians group, supports imposing vicarious liability upon HMOs for the medical malpractice of their physi-

cians under the doctrine of implied authority. The Society argues that Share is disingenuous in its claim that HMOs cannot impact the medical care of its subscribers. The Society asserts that HMOs throughout Illinois are in fact operating in a manner which convolutes the decisionmaking process regarding health care. The Society submits that HMOs should not be allowed to escape legal liability for the medical malpractice of physicians whom the HMOs control.

Speaking in general terms, the Society argues that HMOs assert control over physicians in a variety of ways. First, the Society discusses the contracts that HMOs enter into with their physicians. According to the Society, in these contracts, HMOs often require that they be given (1) the right to make prospective decisions of medical necessity and (2) the right to refuse to pay for health care that the HMO perceives to be inappropriate or outside the scope of its policy. These contracts may even bar a physician from providing medical care to a patient without obtaining advance approval from the HMO. Second, the Society points to HMO cost-containment practices. The Society claims that, although HMOs perform some cost-containment practices themselves, they often delegate cost-containment functions directly to physicians. The Society maintains that HMOs should be held accountable for the cost-containment activities that they delegate to others. The primary care physician in particular is carrying out the HMO objective of providing care while containing costs, the Society claims. Generally, the primary care physician is responsible for providing basic care to the patient and for coordinating other care for the patient. The primary care physician must approve all medical requests and referrals, and thus acts as a "gatekeeper" for the HMO in the HMO's effort to contain costs and utilization of medical services. Third, the Society notes the HMO use of utilization-review

processes. According to the Society, where HMOs retain the right to make decisions about what health care is "medically necessary" or "medically appropriate," physicians are no longer in control of treatment. The Society asserts that prospective utilization-review procedures are the most harmful form of interference perpetrated by HMOs. In a typical scenario, the physician recommends that certain care be provided to the patient, but the HMO refuses to provide the care finding that it is not necessary or appropriate. Lastly, the Society warns that HMO control is not always easy to discern. It explains that the complex relationships involved "raise incredibly intricate fact patterns which limit like the walls in a maze the ability of physicians or patients to freely make decisions based upon their best judgment."

We now address whether the implied authority doctrine may be used against HMOs to negate a physician's status as an independent contractor. Our appellate court in *Raglin* suggested that it can. *Raglin v. HMO Illinois, Inc.*, 230 Ill. App. 3d 642, 647 (1992). Case law from other jurisdictions lends support to this view as well. *Schleier v. Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.*, 876 F.2d 174, 177 (D.C. Cir. 1989) (holding an HMO vicariously liable for the negligence of an independent-contractor physician by applying the traditional test for whether a "master-servant" relationship existed); *cf. Sloan v. Metropolitan Health Council of Indianapolis, Inc.*, 516 N.E.2d 1104, 1109 (Ind. App. 1987) (holding that HMOs may be held vicariously liable for the medical malpractice of employee-physicians, where the usual requisites of an agency or employer-employee relationship exist, but the case involved a physician who was an employee and not an independent contractor).

Share, however, relies on a select few of the many Illinois appellate decisions available in the hospital context to support its contention that it cannot control the medi-

cal judgment of physicians. Namely, Share relies on *Greene v. Rogers*, 147 Ill. App. 3d 1009 (1986); *Johnson v. Sumner*, 160 Ill. App. 3d 173 (1987); and *Northern Trust Co. v. St. Francis Hospital*, 168 Ill. App. 3d 270 (1988), all of which have been overruled in part on other grounds by *Gilbert*. Share also relies on *Zajac v. St. Mary of Nazareth Hospital Center*, 212 Ill. App. 3d 779 (1991). In each of the cases cited by Share, our appellate court rejected a plaintiff's argument that an independent-contractor physician was subject to the hospital's control so as to negate the physician's status as an independent contractor. These decisions found it important that the hospital did not control the physician's actions as to how medical care was delivered and that the physician was not paid by the hospital. *Zajac*, 212 Ill. App. 3d at 791-93; *Northern Trust Co.*, 168 Ill. App. 3d at 275-77; *Johnson*, 160 Ill. App. 3d at 175-77; *Greene*, 147 Ill. App. 3d at 1014-16.

We do not find the above decisions rendered in the hospital context to be dispositive of whether an HMO may exert such control over its physicians as to negate their status as independent contractors. We can readily discern that the relationships between physicians and HMOs are often much different than the traditional relationships between physicians and hospitals. This reality is underscored by the *amicus* brief filed by the physicians' group. Therein, the Society describes in concrete terms how many physicians in Illinois perceive their current relationships with HMOs. The Society's description of that relationship does not resemble the traditional relationship between physicians and hospitals. We reject Share's claim that, for purposes of the implied authority doctrine, the exercise of medical judgment by physicians can never be subject to control by an HMO.

Physicians, of course, should not allow the exercise of their medical judgment to be corrupted or controlled.

Physicians have professional ethical, moral and legal obligations to provide appropriate medical care to their patients. These obligations on physicians, however, will not act to relieve an HMO of its own legal responsibilities. Where an HMO effectively controls a physician's exercise of medical judgment, and that judgment is exercised negligently, the HMO cannot be allowed to claim that the physician is solely responsible for the harm that results. In such a circumstance, both the physician and the HMO are liable for the harm that results. We therefore hold that the implied authority doctrine may be used against an HMO to negate a physician's status as an independent contractor. An implied agency exists where the facts and circumstances show that an HMO exerted such sufficient control over a participating physician as to negate that physician's status as an independent contractor, at least with respect to third parties. *Raglin*, 230 Ill. App. 3d at 647; see *John Gabel Manufacturing Co.*, 390 Ill. at 461.

No precise formula exists for deciding when a person's status as an independent contractor is negated. Rather, the determination of whether a person is an agent or an independent contractor rests upon the facts and circumstances of each case. *Merlo v. Public Service Co.*, 381 Ill. 300, 319 (1942). As noted, the cardinal consideration is whether that person retains the right to control the manner of doing the work. *John Gabel Manufacturing Co.*, 390 Ill. at 461. Facts bearing on the question of whether a person is an agent or an independent contractor include "the question of the hiring, the right to discharge, the manner of direction of the servant, the right to terminate the relationship, and the character of the supervision of the work done." *Merlo*, 381 Ill. at 319. The presence of contractual provisions subjecting the person to control over the manner of doing the work is a traditional *indicia* that a person's status as an independent contractor

should be negated. See 41 Am. Jur. 2d *Independent Contractors* §§ 11, 13, at 407, 411 (1995). The presence of one or more of the above facts and *indicia* are not necessarily conclusive of the issue. They merely serve as guides to resolving the primary question of whether the alleged agent is truly an independent contractor or is subject to control.

With these established principles in mind, we turn to the present case. Plaintiff contends that her physicians' status as independent contractors should be negated. Plaintiff asserts that Share actively interfered with her physicians' medical decisionmaking by designing and executing its capitation method of compensation and "quality assurance" programs. Plaintiff also points to Share's referral system as evidence of control.

Plaintiff submits that Share's capitation method of compensating its medical groups is a form of control because it financially punishes physicians for ordering certain medical treatment. The record discloses that Share utilizes a method of compensation called "capitation." See Ill. Rev. Stat. 1991, ch. 111½, par. 1402(14). Under capitation, Share prepays contracting medical groups a fixed amount of money for each member who enrolls with that group. In exchange, the medical groups agree to render health care to their enrolled Share members in accordance with the Share plan. Each medical group contracting with Share has its own capitation account. Deducted from that capitation account are the costs of any services provided by the primary care physician, the costs of medical procedures and tests, and the fees of all consulting physicians. The medical group then retains the surplus left in the capitation account. The costs for hospitalizations and other services are charged against a separate account. Reinsurance is provided for the capitation account and the separate account for certain high cost claims. Share pays Illinois Masonic in

accordance with its capitation method of compensation. Dr. Kowalski testified that Illinois Masonic pays her the same salary every month. Plaintiff maintains that a reasonable inference to be drawn from Share's capitation method of compensation is that Share provides financial disincentives to its primary care physicians in order to discourage them from ordering the medical care that they deem appropriate. Plaintiff argues that this is an example of Share's influence and control over the medical judgment of its physicians.

Share counters that its capitation method of compensation cannot be used as evidence of control here because Dr. Kowalski is paid the same salary every month. We disagree with Share that this fact makes Share's capitation system irrelevant to our inquiry. Whether control was actually exercised is not dispositive in this context. Rather, the *right to control* the alleged agent is the proper query, even where that right is not exercised. *Ross v. Cummins*, 7 Ill. 2d 595, 600 (1956); see generally 41 Am. Jur. 2d *Independent Contractors* § 10, at 406-07 (1995) (noting rule).

We next evaluate the evidence that plaintiff labels Share's "quality assurance program." It is important to note that two different sets of facts are at issue here.

First, Susan Kirkwood, Share's quality assurance manager, testified that Share performs medical record reviews pursuant to the regulations of the Department of Public Health. Kirkwood explained that, once every two years, Share randomly selects for retrospective review the medical records of ten patients who had been seen or treated by each of its primary care physicians. This review does not assess the diagnostic accuracy or opinions of the treating physician, but rather looks for information that Share expects the medical records to contain.

We find that the above testimony by Kirkwood is merely describing Share's compliance with a "medical

record review program," which is required by regulation. The Department of Public Health requires all HMOs to have a "medical record review program" that (1) establishes the minimum charting standards for providers, (2) "provides for a review and evaluation of the medical record documentation of each primary care physician at least once every two years," and (3) "includes a program of correction and education that will be implemented when deficiencies relative to chart documentation are found." 77 Ill. Adm. Code § 240.60(c)(1) (1991). The regulations also require that health care providers maintain certain written medical records on patients, which shall be available to the medical and administrative staff of the HMO and the Department. 77 Ill. Adm. Code §§ 240.60, 240.90 (1991). Share argues that this testimony by Kirkwood does not assist plaintiff in establishing a claim of implied agency. We agree. Share's action of complying with the above regulations is not evidence of control by Share over its physicians.

The second set of facts is that a Share representative visits Dr. Kowalski's office to review patients' charts at least once each year. Dr. Kowalski called this "quality assurance review," and stated that the Share representative would "make sure that the patients are cared for in an appropriate manner." Dr. Kowalski is contractually required to allow Share access to the medical records of its members. Susan Kirkwood testified that a physician could be terminated from Share's network for giving "inappropriate" care. Plaintiff argues that, from these facts, a trier of fact could reasonably infer that Share conducts these reviews in order to discourage its primary care physicians from giving "inappropriate" medical care, which means medical care that is too expensive and thus not profitable to Share.

Share responds that the "quality assurance review" referred to in the above paragraph is completely retro-

spective in nature and resembles the peer-review process in hospitals. As such, Share asserts, it should not be considered as evidence of control. We cannot accept Share's interpretation of the record. In reviewing whether summary judgment was properly awarded to Share, we must view the evidence in the light most favorable to plaintiff. The record does not explain how Share conducts this "quality assurance review." Dr. Kowalski admitted that she was not certain how Share conducts these reviews, and the record contains no indication that these reviews resemble the hospital peer-review process. Kirkwood stated that Share conducts both concurrent and retrospective reviews. Accordingly, we reject Share's characterization of this evidence.

Plaintiff next points to Share's referral system as evidence of control. The evidence noted in this regard also suggests that Dr. Kowalski's position as a primary care physician requires her to fulfill a role as "gatekeeper" for Share. The record discloses that each Share member selects a primary care physician from the Share network who will provide that member's overall care and authorize referrals when necessary. Share's primary care physicians, pursuant to their contracts with Share, are then required to approve all patient requests for care and all referrals to specialists. In approving a referral, Share's primary care physicians use Share's standard referral forms. Share specialists will not see a Share member without a referral form.

We conclude that plaintiff has presented adequate evidence to entitle her to a trial on the issue of implied authority. All the facts and circumstances before us, if proven at trial, raise the reasonable inference that Share exerted such sufficient control over Drs. Kowalski and Friedman as to negate their status as independent contractors. As discussed above, plaintiff presents relevant evidence of Share's capitation method of compensa-

tion, Share's "quality assurance review," Share's referral system and Share's requirement that its primary care physicians act as gatekeepers for Share. These facts support plaintiff's argument that Share subjected its physicians to control over the manner in which they did their work. The facts surrounding treatment also support plaintiff's argument. According to plaintiff's evidence, Dr. Kowalski referred plaintiff to Dr. Friedman. Dr. Friedman evaluated plaintiff and recommended that plaintiff have either an MRI test or a CT scan performed on the base of her skull. Dr. Friedman, however, did not order the test that he recommended for plaintiff. Rather, he reported this information back to Dr. Kowalski in her role as plaintiff's primary care physician. Dr. Kowalski initially sent Dr. Friedman a copy of an old MRI test. Dr. Kowalski later ordered that an updated MRI be taken. In doing so, she directed that the MRI be taken of plaintiff's "brain." Hence, that MRI failed to image the base of plaintiff's skull as recommended by Dr. Friedman. Dr. Kowalski then reviewed the MRI test results herself and informed plaintiff that the results revealed no abnormality. From all the above facts and circumstances, a trier of fact could reasonably infer that Share promulgated such a system of control over its physicians that Share effectively negated the exercise of their independent medical judgment, to plaintiff's detriment.

We note that Dr. Kowalski testified at an evidence deposition that she did not feel constrained by Share in making medical decisions regarding her patients, including whether to order tests or make referrals to specialists. This testimony is not controlling at the summary judgment stage. The trier of fact is entitled to weigh all the conflicting evidence above against Dr. Kowalski's testimony.

In conclusion, plaintiff has presented adequate evidence to support a finding that Share exerted such suf-

ficient control over its participating physicians as to negate their status as independent contractors. Share, therefore, is not entitled to summary judgment against plaintiff's claim of implied authority.

One final matter remains to be addressed with respect to implied authority. Plaintiff also testified that, after Dr. Friedman recommended that plaintiff have an MRI or CT scan performed on the base of her skull, Dr. Kowalski told her that Share would not allow new tests. Plaintiff asserts that this statement is compelling evidence that Share controlled the physicians' exercise of medical judgment because it shows that Share would not allow the care recommended by Dr. Friedman. Share counters that this testimony cannot be considered as evidence against Share to establish the existence of an agency relationship. We need not address this argument in this appeal. As earlier noted, our task here is to determine whether summary judgment was properly awarded to Share. Even if this testimony is removed from consideration, Share is not entitled to summary judgment. Accordingly, we express no opinion regarding this issue.

## CONCLUSION

An HMO may be held vicariously liable for the negligence of its independent-contractor physicians under both the doctrines of apparent authority and implied authority. Plaintiff here is entitled to a trial on both doctrines. The circuit court therefore erred in awarding summary judgment to Share. The appellate court's judgment, which reversed the circuit court's judgment and remanded the cause to the circuit court for further proceedings, is affirmed.

*Affirmed.*

JUSTICE RATHJE took no part in the consideration or decision of this case.