# Illinois Official Reports

## Appellate Court

*Magnini v. Centegra Health System*, 2015 IL App (1st) 133451

| | |
|---|---|
| Appellate Court Caption | JULIE MAGNINI and MARTIN MAGNINI, Plaintiffs-Appellants, v. CENTEGRA HEALTH SYSTEM, a Corporation, Defendants-Appellees (John Alverdy, University of Chicago Hospitals, a Corporation, Amir Heydari, Aaron Schwaab, Richard E. Lind, M.D., S.C. d/b/a Surgical Associates of Fox Valley, S.C., a Corporation, and BMI Weight Busters Weight Loss Center Inc., a Corporation, Defendants). |
| District & No. | First District, Third Division<br>Docket No. 1-13-3451 |
| Filed | June 10, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-L-9361; the Hon. John P. Kirby, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Clifford Law Offices, P.C., of Chicago (Keith A. Hebeisen, Susan A. Capra, and Sara F. King, of counsel), for appellants.<br><br>Swanson, Martin & Bell, LLP, of Chicago (Kay L. Schichtel, Catherine Basque Weiler, and Megan E. Schneider, of counsel), for appellees. |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion.<br>Presiding Justice Pucinski and Justice Hyman concurred in the judgment and opinion. |

**OPINION**

¶ 1        Plaintiff Julie Magnini brought a medical malpractice suit against Centegra Health System, Dr. Amir Heydari, Dr. Aaron Schwaab, Dr. Richard Lind (collectively, the doctors), and various other defendants not relevant to this appeal. She alleged that she was injured as a result of gastric bypass surgery performed at Centegra Hospital in 2007, as well as later surgeries to treat complications arising out of the original surgery. Additionally, Julie's husband, Martin Magnini, sought damages for loss of consortium.

¶ 2        The Magninis sought recovery against Centegra on a theory of vicarious liability, alleging that the doctors were "agents and employees" of Centegra. The trial court granted summary judgment for Centegra, finding that the doctors were independent contractors, not agents, since Centegra did not control the manner in which they rendered care to patients. The Magninis appeal, arguing that there is an issue of material fact as to whether Centegra retained sufficient control over the doctors to negate their status as independent contractors. Finding no error, we affirm.

BACKGROUND

¶ 3

¶ 4        The Magninis' fourth amended complaint, which frames the issues in this appeal, alleges that on October 30, 2007, Julie underwent Roux-en-Y gastric bypass surgery for obesity at Centegra Hospital. The procedure was performed by Drs. Heydari and Schwaab. Following the operation, Julie experienced persistent abdominal pain, inability to eat, excessive weight loss, and malnourishment. She was repeatedly hospitalized at Centegra Hospital for continuing treatment of her complications. Drs. Heydari, Schwaab, Lind, and Eugene Lee all played roles in her treatment and care.

¶ 5        In its count against Centegra, the complaint alleges that Drs. Heydari, Schwaab, Lind, and Lee were all agents and employees of Centegra. The complaint further alleges that Drs. Heydari and Schwaab negligently performed the initial gastric bypass surgery on Julie, and all four doctors improperly treated her resulting complications, causing her to sustain various injuries. The complaint therefore seeks relief against Centegra for the doctors' alleged negligence.

¶ 6        Centegra moved for summary judgment. In its motion, Centegra argued that the Magninis raised no allegations of direct or institutional negligence against Centegra; their sole theory of liability was that Centegra was vicariously liable for the actions of the doctors. However, according to Centegra, none of the doctors was its actual or apparent agent. Dr. Heydari was an "independent member of the medical staff at Centegra." Centegra further stated that Drs. Schwaab, Lind, and Lee were all employees of Surgical Associates of Fox Valley (SAFV), a medical services corporation, and they were not employees of Centegra.

¶ 7        In support of its summary judgment motion, Centegra attached the deposition testimony of the four doctors. Dr. Heydari testified that he had both administrative and clinical responsibilities at Centegra Hospital. On the administrative side, he was the director of bariatric health services at Centegra. He explained that bariatrics is a branch of medicine dealing with weight loss. As director, he would meet with nurses, dieticians, secretaries, and patients on a regular basis, and he was available to answer any questions that people might

have about the program. Additionally, he stated that he was tasked with "[b]eing an advisor, giving direction which way our bariatric program is going."

¶ 8 Dr. Heydari testified that in addition to his administrative role, he also had a clinical role as an independent surgeon practicing medicine. Dr. Heydari's administrative and clinical roles were "two different hats." When Dr. Heydari made decisions about what kind of surgery would be best for Julie, or what actions to take during surgery, those decisions were independent decisions that he made based upon his own expertise as an independent member of the medical staff. When Dr. Heydari performed surgery, he was not acting as an employee of Centegra.

¶ 9 Dr. Schwaab testified that he had never been an employee of Centegra. He stated that he was the medical director of the breast program at Centegra, as well as the director of the wound and hyperbaric center, but he did not see Julie in connection with either of those programs.

¶ 10 Dr. Lind was the founding member of SAFV and Drs. Heydari, Schwaab, and Lee were all hired by SAFV. He stated that he was not employed by Centegra at the time he provided health care services to Julie, and his provision of such services was based upon his independent judgment as an independent contractor. Similarly, Dr. Lee testified that he was not an employee of Centegra, and he was acting as an employee of SAFV when he provided care to Julie.

¶ 11 The Magninis filed a response to Centegra's summary judgment motion in which they argued that a genuine issue of material fact existed as to whether Centegra controlled the manner in which its doctors provided medical care services to patients. They argued that such control was evidenced by the 2004 medical director services agreement, whereby Dr. Heydari became the director of bariatric health services at Centegra; the 2009 bariatric services agreement, whereby SAFV became the exclusive provider of bariatric surgery services at Centegra; and Centegra's medical staff bylaws. All three documents were attached to the response.

¶ 12 The medical director services agreement between Centegra and Dr. Heydari was entered into on October 1, 2004. Under that agreement, Dr. Heydari accepted the administrative position of director of bariatric health services at Centegra. The agreement states that, as director, Dr. Heydari would make efforts to improve the quality of care and reduce the cost of care. He was also required to work with the site administrator on an annual program evaluation to assess evidence of the program's improvement and its need for further improvement. The agreement states that these administrative services are "distinct and separate from any general patient care services the Director should assume." The agreement stipulates that Dr. Heydari was not to spend more than 10 hours per month on these administrative services, and he was paid for the time he spent. It also provides:

> "5.3 Independent Contractor–Nothing contained in the Agreement shall constitute or be construed to create a partnership, joint venture, employment, or agency relationship between the parties and/or their respective successors and assigns, it being mutually understood and agreed that the parties shall provide the services and fulfill all other obligations hereunder as independent contractors. [Centegra] shall neither have, nor exercise any control, over the methods by which Director shall perform responsibilities."

¶ 13 The bariatric services agreement, entered into by Centegra, SAFV, and Dr. Heydari on May 27, 2009, provides that SAFV will be the exclusive provider of bariatric surgery services

at Centegra. The agreement lists a surgeon roster of five doctors, including Drs. Heydari, Schwaab, Lind, and Lee, and states that changes to the roster may only be made with prior approval by Centegra. It further provides that SAFV will work with Centegra on "cost reduction initiatives" and will work with Centegra's director of surgical services to prepare an annual report. Regarding this report, the agreement states that "[a]ll parties shall mutually agree upon findings and recommendations and shall use best efforts to implement recommendations over the next calendar year." The agreement further provides that Centegra will review Dr. Heydari's performance as director of bariatric health services at least once a year and can terminate him from that position if he materially breaches the agreement in any way, including failing to provide services in accordance with the standards required by the agreement.

¶ 14    As to SAFV's and Dr. Heydari's status *vis-à-vis* Centegra, the agreement states:

"7.3 Independent Contractors.

The parties expressly acknowledge and agree that as to any general medical duties performed by SAFV or [Dr. Heydari] during the term of this Agreement, including but not limited to provision of direct care of patients, which duties are separate and distinct from the obligations of Bariatric Medical Director specified in this Agreement, SAFV and [Dr. Heydari] are independent contractors. The parties expressly acknowledge and agree that Centegra shall neither have nor exercise any control over the methods by which SAFV or [Dr. Heydari] shall carry out his general medical duties, and Centegra shall assume no responsibility or liability associated with such conduct by SAFV or [Dr. Heydari]."

¶ 15    Attached to the bariatric services agreement is a document that describes Dr. Heydari's duties as director of bariatric services. Many of the provisions of that document mirror the provisions of the medical director services agreement, as described above, but some are new: according to the document, Dr. Heydari is required to coordinate with Centegra management concerning quality control of all procedures that impact the provision of bariatric services at the hospital. He must also monitor and evaluate the professional performance of individuals providing bariatric services and make recommendations for action, including disciplinary action. He must monitor the financial impact of the bariatric services program and assist Centegra in achieving its financial objectives. Finally, he must direct all aspects of the maintenance and development of the bariatric services program, including "oversight of the appropriateness of care." The document states that these obligations are "separate and distinct" from Dr. Heydari's general medical duties.

¶ 16    Finally, the Magninis relied on Centegra's medical staff bylaws. All physicians with staff privileges at Centegra are required to comply with these bylaws. Because the bylaws are lengthy, we summarize briefly only those portions that are cited by the Magninis as evidence of Centegra's control over the doctors.

¶ 17    The bylaws provide that physicians may only exercise those clinical privileges that have been specifically granted to them by Centegra's board of directors. Physicians may be granted temporary privileges for up to three months by Centegra's chief executive officer, upon consultation with the president of the staff or the appropriate department chair. Physicians with temporary privileges shall act under the supervision of the department chair, and privileges will be withdrawn if either the chief executive officer withdraws the appointment or the president or department chair withdraws the recommendation.

¶ 18    With regard to medical records, the bylaws state that attending practitioners are responsible for preparation of a complete medical record for each patient. Medical records must be completed "in a timely and legible manner." If a patient's medical record is not completed within 30 days of discharge, the physician's clinical privileges will be suspended until the record at issue is completed.

¶ 19    With regard to surgery, the bylaws provide: "Surgeons must be in the Operating Room and ready to scrub at the time scheduled." The bylaws state that if a surgeon fails to comply with this regulation, the surgery will be rescheduled to the end of that day. Additionally, if a surgeon fails to comply more than three times in a three-month period, the surgeon's privileges may be curtailed for one month.

¶ 20    Finally, the bylaws state the following regarding consultations:

> "When, in the judgment of the attending practitioner, a consultation or consultations will benefit the patient, he shall request consultation with an approved consultant of the Medical Staff in the following patient care areas:
>
> A. All major medical and surgical cases in which the patient is not a good risk;
>
> B. In which the diagnosis is obscure;
>
> C. Where there is an unusually complicated situation where specific skill of another practitioner is needed;
>
> D. Where the patient exhibits severe psychiatric symptoms;
>
> E. Other operations which may interrupt a known or suspected pregnancy."

¶ 21    On October 2, 2013, the trial court granted Centegra's motion for summary judgment, finding that the Magninis could not establish that the doctors were agents of Centegra. The trial court also entered a finding pursuant to Supreme Court Rule 304(a) (Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010)) that there was no just reason to delay enforcement of the order. The Magninis appealed.

¶ 22                                          ANALYSIS

¶ 23    The Magninis argue that the trial court erred in finding that the doctors were not agents of Centegra, since the medical director services agreement, the bariatric services agreement, and Centegra's bylaws create issues of material fact as to whether Centegra retained control over the doctors' actions. The Magninis therefore contend that the trial court erred in granting summary judgment to Centegra. We review the trial court's grant of summary judgment *de novo* (*Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008)), keeping in mind that summary judgment is only appropriate where "there is no genuine issue as to any material fact and *** the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2012). We must construe the record strictly against the movant and liberally in favor of the nonmoving party. *Williams*, 228 Ill. 2d at 417. In order to prevail, the nonmoving party must present some evidence that would arguably entitle that party to recover at trial. *Keating v. 68th & Paxton, L.L.C.*, 401 Ill. App. 3d 456, 472 (2010).

¶ 24    In Illinois, a hospital may be liable in a medical malpractice action in two circumstances: directly, when the hospital owes the plaintiff an independent duty to review and supervise the plaintiff's medical care, or vicariously, when there exists a principal-agent relationship between the hospital and the physician accused of malpractice. *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 518 (1993). In this case, the Magninis' claims against Centegra are

premised solely upon a theory of vicarious liability. Specifically, they argue that Centegra is vicariously liable for the doctors' alleged negligence under a theory of actual agency.[1]

¶ 25 To prevail on a claim for actual agency, or *respondeat superior*, a plaintiff must establish that (1) a principal-agent relationship existed between the defendant and the actor, (2) the principal controlled or had the right to control the conduct of the alleged agent; and (3) the alleged conduct fell within the scope of the agency. *Wilson v. Edward Hospital*, 2012 IL 112898, ¶ 18. The " 'hallmark of agency' " is the principal's right to control the manner in which the agent performs the work. *Simich v. Edgewater Beach Apartments Corp.*, 368 Ill. App. 3d 394, 402 (2006) (quoting *Kaporovskiy v. Grecian Delight Foods, Inc.*, 338 Ill. App. 3d 206, 210 (2003)). By contrast, an independent contractor undertakes to produce a given result but is not controlled with regard to how that result is achieved. *Id.* A principal will generally not be held vicariously liable for the acts of an independent contractor. *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 31 (1999). The reason for this limitation on liability is that "by definition of the relationship between a principal and an independent contractor, the principal does not supervise the details of the independent contractor's work and therefore is not in a good position to prevent negligent performance." (Internal quotation marks omitted.) *Horwitz v. Holabird & Root*, 212 Ill. 2d 1, 11 (2004). For this reason, a hospital is generally not liable for the actions of one who provides medical care as an independent agent outside the hospital's control. *Wogelius v. Dallas*, 152 Ill. App. 3d 614, 621 (1987); see also *Buckholtz v. MacNeal Hospital*, 337 Ill. App. 3d 163, 172 (2003) (noting that "the decision to treat a patient in a particular manner is generally a medical question entirely within the discretion of the treating physician and not the hospital").

¶ 26 In determining whether an actor is an agent or an independent contractor, the primary consideration is whether the principal retains the right to control the manner in which the work is performed. *Petrovich*, 188 Ill. 2d at 42; see *Horwitz,* 212 Ill. 2d at 13 ("An independent contractor is defined by the level of control over the manner of work performance."). Where the principal retains a sufficient right of control, the actor's status as an independent contractor is negated and the principal is subject to liability for the actor's tortious actions under the doctrine of *respondeat superior. Petrovich*, 188 Ill. 2d at 42. The intent of the parties is not dispositive if the conduct of the parties demonstrates the existence of an agency relationship. *Oliveira-Brooks v. Re/Max International, Inc.*, 372 Ill. App. 3d 127, 134 (2007).

¶ 27 Here, Centegra argues, and the trial court found, that the doctors are independent contractors, and therefore Centegra cannot be held vicariously liable for any negligence in connection with their treatment of Julie. We agree.

---

[1]The Magninis also argued the issue of apparent agency before the trial court, but they explicitly disavow any such claim in their briefs on appeal, and it is therefore abandoned. See *People v. Dabbs*, 239 Ill. 2d 277, 294 (2010). In any event, an apparent agency claim would be unavailing. A hospital may only be held liable on a theory of apparent agency where the treating physician is held out as an agent of the hospital. *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 522 (1993). In this case, it is undisputed that over the course of her treatment with SAFV, Julie signed 82 consent forms which stated that her physicians were independent contractors and not agents of Centegra. Based upon these forms, it is clear that Julie knew or should have known that her physicians were not being held out as agents of Centegra.

¶ 28    Initially, we observe that Drs. Heydari, Schwaab, Lind, and Lee all testified in their depositions that they are not employees of Centegra. The doctors also testified about their independence in making patient care decisions. Dr. Heydari stated that his decisions about what surgery would be best for Julie or what actions to take during surgery were independent decisions that he made based upon his own expertise as an independent member of the medical staff. Dr. Lind likewise testified that his provision of health care services was up to his independent judgment as an independent contractor.

¶ 29    The doctors' testimony in this regard is corroborated by the bariatric services agreement and the medical director services agreement, both of which provide that physicians retain exclusive control over treatment decisions. The bariatric services agreement, under the heading "Independent Contractors," explicitly states that "Centegra shall neither have nor exercise any control over the methods by which SAFV or [Dr. Heydari] shall carry out his general medical duties, and Centegra shall assume no responsibility or liability associated with such conduct by SAFV or [Dr. Heydari]." Similarly, the medical director services agreement states: "[It is] mutually understood and agreed that the parties shall provide the services and fulfill all other obligations hereunder as independent contractors. [Centegra] shall neither have, nor exercise any control, over the methods by which Director shall perform responsibilities."

¶ 30    The Magninis nevertheless argue that even though the parties may have intended to create an independent contractor relationship, that intent is not dispositive in light of other evidence which demonstrates the existence of an agency relationship. See *Oliveira-Brooks*, 372 Ill. App. 3d at 134. We turn now to examine that evidence.

¶ 31    The Magninis first argue that Centegra's bylaws constitute evidence of Centegra's control over the physicians that practice there. All physicians with privileges at Centegra must comply with the policies and procedures set forth in the bylaws, including preparing medical records for patients, being in the operating room at the time scheduled for surgery, and requesting consultations in certain patient care areas "[w]hen, in the judgment of the attending practitioner, a consultation or consultations will benefit the patient." Additionally, the bylaws provide that physicians may be granted temporary privileges for up to three months by Centegra's chief executive officer.

¶ 32    All of these policies concern matters that are collateral to patient care decisions, which remain in the exclusive control of physicians. For instance, although the bylaws direct surgeons to be in the operating room at the time scheduled for surgery, they do not purport to direct the actions taken by surgeons during surgery, nor do they restrict what forms of surgery that surgeons may recommend to their patients. Consultation decisions are explicitly left up to "the judgment of the attending practitioner." Thus, the bylaws do not interfere with practitioners' exercise of independent medical judgment and, correspondingly, do not negate the doctors' status as independent contractors. As this court has previously observed, the relationship between a hospital and staff members who are not regular hospital employees "has traditionally been an independent relationship even though both parties must cooperate for the purposes of hospitalization to succeed. The necessity for co-operation neither authorizes [n]or requires a change or an abandonment of the independent roles of each." *Hundt v. Proctor Community Hospital*, 5 Ill. App. 3d 987, 990 (1972).

¶ 33    Consistent with *Hundt*, this court has held on multiple occasions that requiring an independent contractor to follow certain policies and procedures does not, standing alone, constitute sufficient control to create an agency relationship. In *Oliveira-Brooks*, 372 Ill. App.

3d at 128, plaintiff sued a franchisor, Re/Max International, alleging that it was vicariously liable for the negligence of a franchise employee. As evidence of Re/Max's control over its franchisees, plaintiff cited the testimony of the franchise owner, who stated that Re/Max required her to attend a training course and to abide by the Re/Max system of operating her franchise. *Id.* at 131-32. Nevertheless, the *Oliveira-Brooks* court held that Re/Max was entitled to summary judgment, explaining: "Although there is evidence that Re/Max International promulgated policies and procedures intended for franchisees, there is no evidence that it retained the right to control the specific means and manner by which [franchisee] sales associates conduct their day-to-day real estate activities so as to negate Re/Max International's intent." *Id.* at 135. Likewise, in *Salisbury v. Chapman Realty*, 124 Ill. App. 3d 1057, 1061 (1984), a franchisee agreed to conduct its business in accordance with the franchisor's operations manual, but the franchisor did not hire or fix the compensation of the franchisee's employees, nor did it control the franchise's day-to-day operation. Under these facts, the court found that the franchisor did not exercise the requisite control over the franchisee to create an agency relationship. *Id.*

¶ 34    A similar result was reached in *Slates v. International House of Pancakes, Inc.*, 90 Ill. App. 3d 716, 727 (1980), where the court held that a franchisee was not an agent of its franchisor. The franchise agreement explicitly stated that the franchisee was an independent contractor. *Id.* at 721. However, the franchisee was required to comply with the franchisor's operational procedures manual, which covered a wide range of topics including training and supervision of franchisees and restaurant managers, recordkeeping, quality control, and standards for training, promotions, advertising, food preparation, and service. *Id.* at 727. The *Slates* court acknowledged that the franchisor retained a "high degree of supervision" over its franchisees but stated that "this control was not so all encompassing as to negate the express intention of the parties in the franchise agreement that no agency relationship was created." *Id.*

¶ 35    The instant case is analogous to *Oliveira-Brooks*, *Salisbury*, and *Slates*. Although Centegra promulgated various policies and procedures via its bylaws, there is no evidence that it retained the right to control patient care decisions, decisions that are expressly committed to the individual doctors' discretion and independent medical judgment. The degree of control expressed in the bylaws is therefore insufficient to negate the express intention of Centegra and SAFV that the doctors would remain independent contractors.

¶ 36    Notwithstanding the foregoing, the Magninis argue that the control that Centegra exercises over its physicians is analogous to the control displayed in *Petrovich*, 188 Ill. 2d 17. The *Petrovich* plaintiff sued her health maintenance organization (HMO), alleging that it was vicariously liable for negligence of her treating physicians. The trial court granted summary judgment for the HMO, but the *Petrovich* court reversed, finding that there was an issue of material fact as to whether an agency relationship existed between the HMO and its physicians. *Id.* at 51. In reaching this decision, the court relied upon a number of facts not present here: First, the HMO's method of compensating its medical groups provided financial disincentives for its physicians to order expensive treatments and tests, thus arguably interfering with the physicians' professional judgment. *Id.* at 48. Second, the HMO had a " 'quality assurance review' " where it would review patients' charts once a year to " 'make sure that the patients are cared for in an appropriate manner.' " *Id.* at 49. Physicians could be terminated for giving " 'inappropriate' " care. *Id.* Third, the HMO required each of its primary care physicians to fulfill a " 'gatekeeper' " role: without the approval of her primary care physician, a patient

could not see a specialist, and a specialist could not order procedures or tests. *Id.* at 50. From these facts, the *Petrovich* court held that "a trier of fact could reasonably infer that [the HMO] promulgated such a system of control over its physicians that [the HMO] effectively negated the exercise of their independent medical judgment, to plaintiff's detriment." *Id.* at 51.

¶ 37     None of the facts cited by the *Petrovich* court as evidence of the hospital's control have an analogue in the present case. The Magninis have not presented evidence to suggest that Centegra provides financial disincentives to physicians in ordering the care that they deem necessary for their patients. Nor have they shown that Centegra reviews the appropriateness of physicians' care decisions. On the contrary, as discussed earlier, Centegra explicitly eschews control over the methods by which SAFV's physicians carry out their general medical duties, and Drs. Heydari and Lind both testified that their patient care decisions were based upon their independent judgment as independent members of the medical staff. Finally, there is no evidence that Centegra limits availability of care through a "gatekeeper" system. Accordingly, *Petrovich* does not support the Magninis' contention that the doctors are agents of Centegra.

¶ 38     The Magninis next argue that the bariatric services agreement is evidence of Centegra's control over the doctors. As noted above, that agreement provides that SAFV, the medical services corporation that employs the doctors, is the exclusive provider of bariatric surgery services at Centegra. SAFV agrees to work with Centegra on "cost reduction initiatives" and work with Centegra's director of surgical services to prepare annual reports with recommendations for improving the bariatric program. The Magninis argue that although this agreement is "nominally" between Centegra and SAFV, in practice it functions as nothing more than a dressed-up employment contract between Centegra and the doctors employed by SAFV. They further assert that SAFV "was merely an accommodation to pass monies from Centegra through to the Defendant Doctors."

¶ 39     The Magninis' allegations in this regard are unsupported by the record. The record does not show that the contractual relationship between Centegra and SAFV was merely nominal, or that Centegra used SAFV as a means of controlling the doctors' patient care decisions. Additionally, to the extent that the Magninis' argument hinges upon the issue of payment, it is without merit, since the record does not reflect how the doctors were compensated for their services as physicians.[2] *Ahmed v. Pickwick Place Owners' Ass'n*, 385 Ill. App. 3d 874, 894 (2008) (rejecting conclusory assertions that were not supported by the record on appeal). Consequently, the bariatric services agreement does not serve to negate the doctors' status as independent contractors.

¶ 40     Finally, the Magninis contend that the medical director services agreement creates a material issue of fact as to whether Dr. Heydari is an agent of Centegra by virtue of his position as Centegra's director of bariatric health services. In support, they cite *Barbour v. South Chicago Community Hospital*, 156 Ill. App. 3d 324 (1987). In *Barbour*, the plaintiff's treating physician, Dr. Harrod, performed an unauthorized tubal ligation on her. Plaintiff brought suit against Dr. Harrod and the hospital where the operation was performed. The *Barbour* court found that plaintiff's claims against the hospital were time-barred. *Id.* at 331. However, in *dicta*, the court stated that a question of fact existed as to whether Dr. Harrod was an agent of

---

[2]The record does state that Centegra paid Dr. Heydari for his services as director of bariatric health services; however, as shall be discussed later, this is inapposite to the issue of his independence in his capacity as a physician, rather than as an administrator.

the hospital, based on the fact that he had an administrative position as chairman of the hospital's obstetrics and gynecology department. *Id.* at 329-30. The court reasoned that Dr. Harrod had a "recognized and continuous association with the hospital itself" in that he acted pursuant to the orders of the hospital's board of directors and could be removed if he failed to carry out those orders properly. *Id.* at 329. The court also observed that "any decision by the board to change policy or practice in the obstetrics and gynecology department would have to be implemented by the board through Harrod." *Id.*

¶ 41 The Magninis argue that Dr. Heydari, like Dr. Harrod, has a "recognized and continuous association" with the hospital, which creates an issue of fact as to whether he was an agent. We disagree. *Barbour* is distinguishable from the present case for two reasons. First, as noted earlier, the medical director services agreement explicitly states that, in his capacity as director, Dr. Heydari is an independent contractor. It further states that Centegra "shall neither have, nor exercise any control, over the methods by which Director shall perform responsibilities." This language, which appears to have no parallel in Dr. Harrod's contract in *Barbour*, indicates that Centegra did not retain the right to control the manner in which Dr. Heydari treated his patients, which is the hallmark of an independent contractor relationship. *Petrovich*, 188 Ill. 2d at 42; *Simich*, 368 Ill. App. 3d at 402. Significantly, nothing in either contract or in Centegra's bylaws relied on by the Magninis allows Centegra to terminate Dr. Heydari's hospital privileges for any claimed violation of his administrative duties. Thus, it is clear that Centegra's control over Dr. Heydari is limited to the performance of his contractual duties and does not extend to his independent medical judgment in rendering care to patients.

¶ 42 Second, the medical director services agreement provides that Dr. Heydari's duties as director are "distinct and separate from any general patient care services the Director should assume." Again, no such language was cited by the *Barbour* court. This is significant because the Magninis' complaint does not allege that Dr. Heydari was negligent in the performance of his administrative duties. Rather, it alleges that he was negligent in providing patient care services to Julie–*i.e.*, performing gastric bypass surgery on her and treating her resulting complications. Since the Magninis seek to hold Centegra vicariously liable for Dr. Heydari's actions in his capacity as a physician and not an administrator, and since those duties are "distinct and separate," the issue is the control that Centegra retains over Dr. Heydari's acts as a physician. See Restatement (Third) of Agency § 7.03(2) (2006) (principal is only subject to vicarious liability under a theory of actual agency where employee's tort is within the scope of his employment). For all the reasons discussed above, this control is insufficient to create an agency relationship between Dr. Heydari and Centegra or to give rise to any genuine issue of material fact that would preclude summary judgment in Centegra's favor.

¶ 43                                                   CONCLUSION

¶ 44 The trial court did not err in granting summary judgment for Centegra based upon its finding that the allegedly negligent doctors were independent contractors and not agents of Centegra. Accordingly, we affirm the judgment of the trial court.

¶ 45      Affirmed.