2019 IL App (1st) 18-2433-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
December 17, 2019

No. 1-18-2433

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| JENNIFER DeANGELO, as Plenary Guardian of ANTONIO DeANGELO, a currently disabled adult, | ) ) ) | Appeal from the Circuit Court of Cook County, Illinois, |
| Plaintiff-Appellant, | ) ) | County Department, Law Division |
| v. | ) ) | |
| JAMES A. WILCOX, D.O.; ADVOCATE HEALTH PARTNERS, d/b/a ADVOCATE PHYSICIANS PARTNERS, a not-for-profit corporation, O. BARTOLOMEO, M.D., S.C., d/b/a BARRINGTON FAMILY MEDICINE, S.C., a corporation; ADVOCATE GOOD SHEPHERD HEALTH PARTNERS, LTD., d/b/a ADVOCATE GOOD SHEPHERD PHYSICIAN PARTNERS, LTD., a corp., and JAMES A. WILCOX, P.C., a professional corporation, | ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 1-18-2433 |
| Defendants, | ) ) ) | The Honorable Patricia O'Brien Sheahan, Judge Presiding. |
| and | ) ) | |
| ADVOCATE HEALTH AND HOSPITALS CORPORATION d/b/a ADVOCATE GOOD SHEPHERD HOSPITAL, a Corporation, | ) ) ) ) | |
| Defendant-Appellant. | ) ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court properly granted summary judgment in favor of the defendant on the issue of actual agency but erred when it granted summary judgment on the issue of apparent agency.  There remain genuine issues of material fact as to whether the defendant created the appearance that the physician whose alleged medical malpractice caused the plaintiff's injury was its agent, and whether the plaintiff reasonably relied on this apparent agency to his own detriment.

¶ 2    This cause of action arises from a medical malpractice action filed by the plaintiff, Jennifer DeAngelo (Jennifer), as plenary guardian on behalf of her currently disabled husband, Antonio DeAngelo (Antonio), stemming from Antonio's single visit to his treating physician, Dr. James A. Wilcox (Dr. Wilcox) at his office located inside O. Bartolomeo, M.D., S.C., d/b/a Barrington Family Medicine (Barrington FM) on January 29, 2015.  The plaintiff's medical malpractice action against Dr. Wilcox and his practice, James A. Wilcox P.C., a professional corporation (Wilcox P.C.) is premised on Dr. Wilcox's failure to appreciate 37-year-old Antonio's hypertension during that appointment and his failure to admit him to the hospital even though he suspected a pulmonary embolism.  As a result, Antonio suffered a debilitating stroke on March 11, 2015.  As part of her medical malpractice action, the plaintiff also sought to hold the following four entities vicariously liable for Dr. Wilcox's medical negligence: (1) Barrington FM; (2) Advocate Health Partners d/b/a Advocate Physician Partners, a not-for-profit corporation and physicians group (Advocate Physician group); (3) Advocate Good Shephard Health Partners, Ltd., d/b/a Advocate Good Shepherd Physicians Partners, Ltd., a corporation (Advocate GS Physician group); and (4) the instant appellee, Advocate Health and Hospitals Corporation d/b/a Advocate Good Shepherd Hospital, a corporation (Advocate or Advocate GS Hospital).

¶ 3    In this appeal, the plaintiff asks that we reverse the circuit court's order reconsidering its

prior partial denial of summary judgment in favor of Advocate, ultimately dismissing it from the case. The plaintiff contends that the trial court erred when it found that, as a matter of law, Advocate could not be held vicariously liable for the negligence of Antonio's treating physician under either actual or apparent agency theories. For the reasons that follow, we affirm in part and reverse in part.

¶ 4                                    I. BACKGROUND

¶ 5        The record before us reveals the following relevant facts and procedural history.

¶ 6                                  A. The Pleadings

¶ 7        The plaintiff filed her complaint on April 25, 2016. Therein she alleged that on June 14, 2014, her 37-year-old husband, Antonio sought treatment at a Walgreens HealthCare Clinic (Walgreens clinic) in Arlington Heights, complaining of a cough with mucus that had persisted for over a week. Antonio's blood pressure was measured at 132/82, leading to a diagnosis of elevated blood pressure. The Walgreens clinic recommended that the plaintiff follow up with his family care physician to rule out hypertension.

¶ 8        On January 29, 2015, Antonio was treated by Dr. Wilcox in his office at Barrington FM. Antonio complained about his persistent cough and difficulty breathing. Dr. Wilcox measured Antonio's blood pressure at 190/102. According to the complaint, Dr. Wilcox's differential diagnosis included acute bronchitis, elevated blood pressure, tachycardia, and morbid obesity. Dr. Wilcox documented his concern that Antonio was possibly suffering from a pulmonary embolism and discussed a possible CT scan with Antonio but agreed that such a test was not necessary at this point. Dr. Wilcox released Antonio from his care, only prescribing medication to treat the acute bronchitis.

¶ 9        According to the complaint, on February 6, 2015, Antonio called Dr. Wilcox's office and

spoke to Katie Miller, complaining of "a sore throat, earache, running nose, etc." Dr. Wilcox refilled Antonio's Zithromax Z-Pack prescription but did not reevaluate him.

¶ 10    The complaint further alleged that on March 11, 2015, the Franklin Park District Fire Department responded to an emergency call to find Antonio in his car, non-verbal and in respiratory distress, attempting to move his right arm with his left. Antonio was transported to Loyola University Health System Hospital (Loyola Hospital) where he underwent a CT scan which confirmed that he had suffered a hemorrhagic stroke. Since then, Antonio has undergone numerous medical procedures and remains physically and mentally disabled.

¶ 11    According to the complaint, Antonio's condition was directly and proximately caused by Dr. Wilcox's failure to: (1) appreciate Antonio's apparent hypertension, and other risk factors (including his morbid obesity, shortness of breath and tachycardia); (2) order an appropriate diagnostic test (such as a CT scan); and (3) admit Antonio to the emergency room, when he believed that there was a possibility of a pulmonary embolism.

¶ 12    The complaint further alleged that all the defendants were vicariously liable for Dr. Wilcox's professional negligence. Relevant to this appeal, the complaint alleged that Antonio never chose Dr. Wilcox as his treating physician. Rather, through his HMO plan, Advocate assigned Dr. Wilcox as Antonio's primary care physician responsible for directing all his health care needs. The complaint further alleged that at all relevant times, Dr. Wilcox and his practice, Wilcox P.C., acted as agents of Barrington FM, and that in turn, Barrington FM was an agent of the Advocate Physician and Advocate GS Physician groups. The complaint alleged that both physician groups were themselves agents of the instant appellee, Advocate. According to the complaint, Advocate never directly informed Antonio, nor gave him any reason to suspect, that it was not in an agency relationship with Dr. Wilcox. Accordingly, Antonio neither knew of should have known that

4

there was no agency relationship, and instead reasonably believed that Dr. Wilcox was an employee of Advocate.

¶ 13 Advocate filed its answer, denying any agency relationship with Dr. Wilcox and with any of the other defendants in this case. Dr. Wilcox filed his answer, *inter alia*, denying that he was ever "an employee, agent, servant, shareholder or partner of" any of the defendants, including Advocate.

¶ 14 B. Discovery

¶ 15 During discovery the following relevant witnesses were deposed: (1) Dr. Wilcox; (2) Antonio; and (3) Jennifer.

¶ 16 In his deposition, among other things, Dr. Wilcox attested that in 2003 he started his own medical practice, Wilcox, P.C. Beginning in October 2003, he shared an office space with Dr. O. Bartolomeo, who owns Barrington FM, and they split the overhead, including telephone bills, staff, and supplies. According to Dr. Wilcox, Dr. Bartolomeo and his wife, who acts as the office manager, were entirely responsible for staffing and supplying the office, and he merely provided half the funds. In addition, because the two physicians were competitors, as a rule, they did not see each other's patients, although over the years they have made a few exceptions.

¶ 17 Dr. Wilcox averred that, when he initially opened his medical practice, he saw patients both in his office and at Advocate GS Hospital. He explained, however, that his hospital visits were terminated in 2008 when the HMO (Tri-Country Physicians Association and BlueCross/BlueShield) mandated that he use "hospitalists." Dr. Wilcox stated that since 2008, he has not treated any patient at Advocate GS Hospital. As such, he explained that when Antonio was hospitalized in 2015, he would not have visited him there.

¶ 18 Dr. Wilcox nonetheless admitted that in 2015 he continued to have general privileges to

practice at several Advocate hospitals, including Advocate GS Hospital and Advocate Sherman Hospital, as well as at Northwest Community Hospital. In his response to the plaintiff's first supplemental request to produce, Dr. Wilcox further attested that he was provided with an Advocate GS Hospital ID badge, when he treated patients there. Correspondingly, in its responses to the plaintiff's interrogatories, Advocate admitted that it provided Dr. Wilcox with such a badge which bore the name "Advocate Health and Hospitals Corporation d/b/a Advocate Good Shepherd Hospital," but indicated that it was to be worn only when Dr. Wilcox was treating patients at Advocate GS Hospital.

¶ 19    In his deposition, Dr. Wilcox also admitted that since 2003 he has been affiliated with the Advocate Physician group and that since 2015 he has had a written contract with them. He explained, however, that he is not an employee of that group, but rather only a member. To the best of his knowledge, Advocate Physician group does not actually have any physician employees. Dr. Wilcox could not recall whether he had contracts with any of the other defendants in this case, including the instant appellee, Advocate. In addition, he did not know whether the Advocate Physician group and the Advocate GS Physician group were the same entity. It was his understanding that Advocate Physician was the broader physicians' group with which he had contracted, and that Advocate GS Physician was his "home base" group by virtue of his location and his privileges to practice at Advocate GS Hospital.

¶ 20    During his deposition, Dr. Wilcox was presented with a welcoming letter that was sent to Jennifer and Antonio at their home and which stated, "Welcome to Advocate Good Shepherd Physician Partners, the physician's group you have chosen to coordinate your medical services under your HMO plan." Dr. Wilcox acknowledged the letter but stated that he had nothing to do

with its writing and that he had never received a copy of it as the physician assigned to treating Antonio.

¶ 21    Dr. Wilcox acknowledged that he received annual bonuses (ranging between $25,000 and $30,000) from the Advocate Physician group based on certain quality initiatives (*i.e.*, end points based on the number of patients he would refer to Advocate hospitals for preventative procedures such as colonoscopies, mammograms, pap smears, diabetic eye exams, children's vaccines and the like). He admitted that as part of these quality initiatives, once a year, he attended a clinical integration meeting at Advocate GS Hospital where he was instructed on that year's quality initiatives. Dr. Wilcox acknowledged that at these meetings he was counseled as to what medications were recommended for certain ailments. In addition, he was advised that he would be penalized if he sent patients "outside of the Advocate network." Specifically, Dr. Wilcox recalled that whenever he referred a patient out-of-network, he would receive a telephone call from Dr. Bob Belter "of the Good Shepherd branch of the Advocate Physician group" and would be asked to explain his reasons for the referral. The two would then work together to find a way to return the patient to a specialist within the Advocate network.

¶ 22    In addition, Dr. Wilcox acknowledged that an "Advocate" entity, which to the best of his understanding was the Advocate Physician group, employed a registered Advocate nurse at his and Dr. Bartolomeo's shared Barrington FM offices. Dr. Wilcox explained that the nurse was not part of the Advocate Physician group's quality initiative program. Instead, she was responsible for reducing the cost of medical care for high-risk patients. Specifically, she was to identify and manage higher utilization patients, *i.e.*, those who cost the Advocate system more money with their frequent emergency room (ER) visits, and re-admissions to the hospital. The goal was to provide these patients with better care and avoid their readmission to the hospital.

Although the nurse occupied Dr. Wilcox's and Dr. Bartolomeo's Barrington FM offices, she brought her own computer and asked Dr. Wilcox for his permission to use his patient charts.

¶ 23    Dr. Wilcox further averred that in 2011, Barrington FM switched to using electronic medical records, in part based on its involvement with "Advocate." Since then, new quality initiatives that were added to the computer were serviced by an information technology (IT) specialist paid by the Advocate Physician group. This individual was not responsible for fixing Dr. Wilcox's computer, and instead merely serviced the applications relevant to Advocate's network.

¶ 24    In addition, Dr. Wilcox acknowledged that he utilized an after-hours answering service called Perfect Serve because the Advocate Physician group had obtained it at a discount rate for its physicians.

¶ 25    On cross-examination, Dr. Wilcox admitted that Advocate GS Hospital did not provide him with any IT support and has never sent any nurses or staff to his office. In addition, Dr. Wilcox attested that he never treated Antonio at Advocate GS Hospital, and never referred him for any type of treatment there.

¶ 26    In his deposition, Antonio, who was clearly disabled and had a difficult time answering, averred that in 2014 he weighed about 400 pounds, but that to his knowledge he had no chronic medical conditions, high blood pressure, or diabetes. He recalled that in June 2014, he went to the Walgreens clinic complaining of a bad cough that had lasted a few months. Between June 2014 and January 29, 2015, when he first saw Dr. Wilcox, he did not seek medical attention or treatment elsewhere. Antonio was insured through his wife's health insurance, which was a BlueCross/BlueShield HMO. Antonio stated that his wife Jennifer chose Dr. Wilcox from a list. Antonio admitted that he never saw Dr. Wilcox at Advocate GS Hospital and was never treated there. He further acknowledged that no one from Advocate GS Hospital ever told him to go see

Dr. Wilcox, referred him to Dr. Wilcox or provided him with any documentation or pamphlet advising him to be treated by Dr. Wilcox.

¶ 27    In her deposition, Jennifer averred that she has known Antonio since 1998 and they have been married since 2004. At the time of Antonio's stroke, Jennifer was pregnant with their second child.

¶ 28    Jennifer stated that at all relevant times she was employed as a teacher by Bensenville School District 2. She, Antonio and their children were all insured through the school district. From the health insurance options provided by her employer, Jennifer chose the Blue Cross/Blue Shield HMO. Jennifer averred that the HMO required her to first select a medical group based on a hospital affiliation. Jennifer had seen many advertisements about Advocate GS Hospital in the Barrington Magazine, on television, and in pamphlets mailed to her home publicizing the hospital's excellent physicians and Advocate's premium level of medical care provided to its patients. Because of its good reputation in the community and because she had a wonderful experience delivering her first child there, Jennifer trusted Advocate GS Hospital, and therefore chose the one available HMO medical group affiliated with Advocate GS Hospital--Advocate Good Shepherd Group 331 (Advocate GS Group 331). Her insurance card identified her medical provider as: "BlueCross/BlueShield HMO" and underneath "331 Advocate GD SHEP."

¶ 29    Jennifer explained that when you have an HMO, there is only a limited number of physicians you can choose from to stay within the medical group. Once she chose Advocate GS Group 331, she was provided with an online member directory of about five physicians from which she could choose. She could not recall whether any of these physicians were affiliated with the Advocate Physician or Advocate GS Physician groups but stated that they all had either "Advocate Good Shepherd" or "Advocate" listed next to their names. After consulting with

9

Antonio, and adhering to his preference for a male physician, from the list on the HMO Advocate GS Group 331 website Jennifer chose Dr. Wilcox.

¶ 30    Before making this choice, Jennifer stated that she looked up Dr. Wilcox's website. She averred that the top of the physician's website had a very large banner with the logo "Advocate Healthcare." While the website nowhere stated that Dr. Wilcox was an employee of Advocate, under his biography it noted his hospital affiliation with Advocate GS Hospital.

¶ 31    While Jennifer agreed that no one from Advocate GS Hospital explicitly "assigned" Dr. Wilcox to be Antonio's physician, she stated that when she received the list of physicians within her HMO Advocate group form which she could choose, it was her understanding that Dr. Wilcox, just as all the other physicians on that list, was "an employee" of Advocate GS Hospital. She explained that the only reason Antonio and she chose Dr. Wilcox was because they believed that he was an employee of Advocate GS Hospital and they had decided that this was the institution from which they wanted to receive their medical care. She trusted Advocate GS Hospital and relied on it to provide Antonio with a physician.

¶ 32    Jennifer admitted that prior to choosing Dr. Wilcox, she never searched for Dr. Wilcox on the Advocate GS Hospital or Advocate Healthcare websites, and that any information she obtained about him was from his own website, and that of her HMO provider. She never spoke to anyone at Advocate GS Hospital to confirm that Dr. Wilcox was one of the hospital's physicians; nor did she receive any documentation from the hospital about Dr. Wilcox that would lead her to this conclusion. She also never saw any Advocate GS Hospital advertisements that involved Dr. Wilcox specifically.

¶ 33    Jennifer also admitted that prior to January 29, 2015, Antonio never received any treatment

of any kind from any physician at Advocate GS Hospital. In addition, on January 29, 2015, Antonio was seen by Dr. Wilcox at his own office at Barrington FM and not at Advocate GS Hospital.

¶ 34                                    C. Summary Judgment

¶ 35     On December 5, 2017, Advocate filed a motion for summary judgment, arguing that as a matter of law the plaintiff had failed to establish either actual or apparent agency, so as to be permitted to proceed against it under a vicarious liability theory. With respect to actual agency, Advocate argued that it neither employed Dr. Wilcox nor directed or controlled the care and treatment he rendered to Antonio. With respect to apparent agency, Advocate asserted that Antonio was never treated at Advocate GS Hospital, and that the plaintiff presented no evidence that the hospital ever "held out" Dr. Wilcox as its agent. Advocate further argued that there was no evidence that Antonio relied on any conduct by the hospital in choosing Dr. Wilcox as his treating physician.

¶ 36     On August 22, 2018, the trial court granted in part and denied in part Advocate's motion for summary judgment. The trial court granted the motion as to actual agency finding that there was no question of material fact as to whether Advocate had any control over Dr. Wilcox. In this respect, the court found that there was no evidence that Advocate set Dr. Wilcox's hours, paid him, had a right to discharge him, gave him any administrative responsibilities, or directed his treatment of patients, and that "simply being provided a nurse by Advocate Good Shepherd" did not indicate that Dr. Wilcox's behavior was "somehow controlled by them."

¶ 37     The trial court, nonetheless, denied Advocate's motion for summary judgment on apparent

agency grounds, finding that there remained genuine issues of material fact as to whether Advocate had held out Dr. Wilcox as its agent and whether Antonio had relied on this in choosing Dr. Wilcox as his treating physician. As the court stated:

> "Based on the testimony of having had great experience with Advocate doctors, there is evidence that Advocate was the driver in plaintiff's making the decision to use Wilcox and the only reason they chose Dr. Wilcox was because of his affiliation with Advocate Good Shepherd."

In coming to its decision, the trial court distinguished the present situation from the facts in the recently decided Illinois Supreme Court's decision in *Yarborough v. Northwestern Memorial Hospital*, 2017 IL 121367, finding that the "driver" for the plaintiff in that case had been finding a clinic that would administer a pregnancy test without requiring her to have insurance, whereas in this case, the plaintiff's insurance card presented to Dr. Wilcox clearly displayed Advocate's name. The court therefore concluded that in the present case there was nothing that affirmatively put the plaintiff on notice of Dr. Wilcox's independent status.

¶ 38     On September 17, 2018, Advocate filed a motion to reconsider arguing that the trial court had misapplied the analytical framework of *Gilbert v. Sycamore*, 156 Ill. 2d 511 (1993) with respect to the "holding out" element of apparent agency. In addition, Advocate contended that the trial court disregarded the limitations set forth on the apparent agency doctrine by the decision in *Yarborough*, where medical care occurs outside of the hospital and at an independent clinic.

¶ 39     On December 5, 2018, the trial court reassessed its application of Illinois apparent agency law to the facts of the case and reversed its initial decision denying Advocate's motion for summary judgment on apparent agency grounds. The trial court now held that the plaintiff

had not presented sufficient evidence to create a question of fact as to whether Dr. Wilcox was an apparent agent of Advocate because: (1) none of Antonio's treatment was received at Advocate GS Hospital and instead occurred at Dr. Wilcox's private unaffiliated office; and (2) the hospital did nothing to hold Dr. Wilcox out as its agent. The trial court therefore granted Advocate's motion for summary judgment in full and dismissed it from the case. The court further found there was no just reason to delay enforcement or appeal of its order pursuant to Illinois Supreme Court Rule 304(a) (eff. March 8, 2016). The plaintiff now appeals.

¶ 40                                   II.  ANALYSIS

¶ 41       On appeal, the plaintiff contends that the trial court erred when it granted Advocate's motion for summary judgment both on the basis of actual and apparent agency. Summary judgment is a drastic measure and should not be granted unless the movant's right to judgment is clear and free from doubt. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). Summary judgment is proper only where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2018); see also *Epple v. LQ Management, LLC*, 2019 IL App (1st) 180853, ¶ 14; *Carlson v. Chicago Transit Authority*, 2014 IL App (1st) 122463, ¶ 21; *Virginia Surety Co. v. Northern Insurance Co. of New York*, 224 Ill. 2d 550, 556 (2007). In determining whether the moving party is entitled to summary judgment, the court must construe the pleadings and evidentiary material in the record in the light most favorable to the nonmoving party and strictly against the moving party. *Epple*, 2019 IL App (1st) 180853, ¶ 14; see also *Happel v. Wal-Mart Stores, Inc.*, 199 Ill. 2d 179, 186 (2002). A genuine issue of material fact exists where the facts are in dispute or where reasonable minds could draw different inferences from the undisputed facts. *Morrissey*

*v. Arlington Park Racecourse, LLC*, 404 Ill. App. 3d 711, 724 (2010); see also *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 114 (1995). The party moving for summary judgment bears the initial burden of proof and may meet it either "by affirmatively showing that some element of the case must be resolved in [its] favor or by establishing that there is an absence of evidence to support the nonmoving party's case." (Internal quotation marks omitted.) *Epple*, 2019 IL App (1st) 180853, ¶ 15. Our review of the trial court's entry of summary judgment is *de novo*, and we may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. See *Epple*, 2019 IL App (1st) 180853, ¶¶ 14-15; see also *Ragan v. Columbia Mutual Insurance Co.*, 183 Ill. 2d 342, 349 (1998).

¶ 42    In the present case, the plaintiff alleged that Advocate should be held liable for the negligence of Dr. Wilcox based on an agency theory. "Agency is a fiduciary relationship in which the principal controls the agent's conduct and the agent has authority to act on the principal's behalf." *Harris v. Symphony Countryside, L.L.C.*, 2019 IL App (1st) 180160, ¶ 17. If a principal-agent relationship exists between Advocate and Dr. Wilcox, Advocate may be held vicariously liable for the physician's alleged negligence. *Id*.

¶ 43                                A.  Actual Agency

¶ 44    The plaintiff first argues the existence of actual agency. Actual agency may be either express or implied. *C.A.M. Affiliates Inc. v. First American Title Insurance Co.,* 306 Ill. App. 3d 1015, 1021 (1999). "An agent has express authority when the principal explicitly grants the agent the authority to perform a particular act." *Id*. Implied authority is actual authority established through circumstantial evidence. *Buckholtz v. MacNeal Hospital*, 337 Ill. App. 3d 163, 172 (2003); *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 43 (1999). To prevail on either type of actual agency, the plaintiff must establish that: (1) a principal-agent relationship

14

existed between the parties; (2) the principal controlled or had the right to control the conduct of the alleged agent; and (3) the alleged conduct fell within the scope of the agency. *Hammer v. Barth*, 2016 IL 143066, ¶ 15.

¶ 45       The hallmark of actual agency is the principal's right to control the manner in which the agent performs the work. *Magnini v. Centegra Health Systems*, 2015 IL 133451, ¶ 25 (quoting *Simich v. Edgewater Beach Apartments Corp.*, 368 Ill. App. 3d 394, 402 (2006) (quoting *Kaporovskiy v. Grecian Delight Foods, Inc.*, 338 Ill. App. 3d 206, 210 (2003)). As such, a principal is generally not liable for the acts of an independent contractor. *Petrovich*, 188 Ill. 2d at 31. The rationale is that an independent contractor undertakes to produce a given result but is neither supervised nor controlled by the principal in the manner in which that result is achieved. *Magnini*, 2015 IL 13341, ¶ 25. Accordingly, the principal is not in a good position to prevent negligent performance. *Id.* However, if the principal retains sufficient control over the independent contractor's work, his status is negated and the principal is vicariously liable for the contractor's negligence under implied authority. *Id.*

¶ 46       There is no precise formula for deciding when a person's status as an independent contractor is negated. *Petrovich*, 188 Ill. 2d at 42. Instead, "the determination of whether a person is an agent or an independent contractor rests upon the facts and circumstances of each case." *Id.* As noted, the primary consideration is the degree of control that the principal retains over the performance of the contractor's work. *Id.* Facts bearing on this question, include: (1) the question of hiring; (2) the right to discharge; (3) the manner of direction of the servant; (4) the right to terminate the relationship; and (4) the character of the supervision of the work done. *Id.* In the healthcare context, the primary issue is whether the hospital had the right to control the physician's exercise of medical judgment in delivering care to patients. *Id.*

¶ 47        While agency itself is a legal concept, "the existence and scope of an agency relationship is a fact-intensive inquiry" generally reserved for the trier of fact, "unless the parties' relationship is so clear so as to be undisputed." *Zahl v. Krupa*, 365 Ill. App. 3d 653, 661 (2006); *McNamee v. Sandore*, 373 Ill. App. 3d 636, 651 (2007); *Gilbert*, 156 Ill. 2d at 524 ("Whether an agent is authorized to act is a question of fact.")

¶ 48        In the present case, the plaintiff concedes that Dr. Wilcox testified in his deposition that he is neither an employee nor an agent of Advocate.  Nonetheless, the plaintiff argues that there remains a genuine issue of material fact as to the amount of control that Advocate exercised over Dr. Wilcox's medical decisions, so as to negate his independent contractor status.  In this respect, the plaintiff points out that Advocate granted Dr. Wilcox general practicing privileges at Advocate GS Hospital and provided him with an ID badge with the Advocate logo to be worn while on site.  Correspondingly, Dr. Wilcox's website contained Advocate's logo and advertised his affiliation with the hospital.  In addition, the plaintiff points out that through the Advocate Physicians' group, which bears Advocate's logo, Dr. Wilcox was: (1) required to provide referrals within the "Advocate" network; (2) coached on quality initiatives and given annual bonuses for completing them by referring patients to certain testing procedures within that network; (3) instructed on what medications to prescribe; (4) given IT support when using the "Advocate" computer systems; and (5) provided with an on-site nurse whose job it was to save the "system" money by reducing the number of patients returning to the hospital.  Based on this record, the plaintiff argues that the trial court erred when it concluded that there was no genuine issue of material fact as to whether Dr. Wilcox was an implied agent of Advocate.  For the reasons that follow, we disagree.

¶ 49        Contrary to the plaintiff's position, a thorough review of Dr. Wilcox's testimony establishes

that aside from providing him with an ID badge, and granting him privileges to practice there, which he had not exercised since 2008, Advocate had no meaningful control over Dr. Wilcox's treatment decisions or his private medical practice. Dr. Wilcox unequivocally testified that his medical decisions were made independently and based upon his own medical expertise. Advocate neither employed Dr. Wilcox nor could discharge him. In addition, it provided no clinical oversight or management of his private practice. Instead, Dr. Wilcox rented his office space from Barrington FM, which was owned and operated by Dr. Bartolomeo. Dr. Wilcox shared the financial burden of overhead costs (including phone bills, paper, staff and supplies) with Dr. Bartolomeo and not Advocate.

¶ 50    The plaintiff's attempt to attribute to Advocate certain perks provided to Dr. Wilcox as part of his membership with Advocate Physician's group is unavailing. When directly asked whether Advocate GS Hospital, rather than the Advocate Physician's group, had ever provided him with any support staff (nurse, IT, or the like) Dr. Wilcox unequivocally testified that it had not.

¶ 51    Nonetheless, even if we were to agree with the plaintiff that despite this testimony, Dr. Wilcox's earlier deposition statement that he was unsure which "Advocate entity" had provided his practice with an on-site nurse, whose responsibility it was to lower the health care costs of the Advocate system by decreasing the number of patients readmitted to the hospital, creates an issue of fact, we would nonetheless find that employing such an Advocate nurse would be insufficient to establish the requisite control. Our courts have repeatedly held that supplying a physician with personnel or equipment alone is insufficient to establish the requisite control over the physician's medical decisions so as to create implied agency. See *e.g.*, *Barton v. Evanston Hospital*, 159 Ill App. 3d 970, 974 (1987) (holding that "[m]erely supplying the doctor with equipment and personnel does not evidence a right to govern his conduct."); *Malanowski v.*

17

*Jabamoni,* 293 Ill. App. 3d 720, 725 (1997) (holding that a physician who allegedly committed malpractice at the university's outpatient clinic was not an agent of the university, but rather an independent contractor, even though the university supplied personnel and equipment to the physician's practice because the university was only the administrative manager of the facility and had no say about how the individual physician practiced medicine there); see also *Buckholtz,* 337 Ill. app. 3d at 173 (holding that the plaintiff failed to establish that anesthesia physician and nurse were actual agents of the hospital where the evidence established that both were employees of the anesthesia associates and not the hospital itself and the only evidence of implied agency was that the nurse and physician were present in the hospital and wore hospital badges). Accordingly, under this record, we hold that as a matter of law Dr. Wilcox was not an implied agent of Advocate.

¶ 52     In coming to this conclusion, we find the decision in *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, relied on by the plaintiff unavailing.   In that case, the plaintiff a salesperson sued her former employer on invasion of privacy grounds. *Lawlor*, 2012 IL 112530, ¶ 112530.  The plaintiff claimed that the employer, through its counsel had retained investigators, who acquired her mobile and home phone records in an effort to prove that she had breached the employer's noncompete agreement. *Id*. at ¶ 4.  The plaintiff sought to hold the employer vicariously liable for the conduct of the investigators in violating her privacy by establishing that the investigators had acted as the employer's agents. *Id*.  The plaintiff provided evidence that her former employer had requested that the investigators obtain her phone records and that it provided the investigators with her information in order to carry out their investigation. *Id.* at ¶ 46.  Our supreme court found that the employer had set into motion the process of obtaining the investigative materials and that its president had assigned personnel to

direct and oversee the investigation. *Id.* at ¶ 46. The court therefore held that there was a sufficient basis for the jury to conclude that the employer had directed, controlled or authorized the methods by which the investigators performed their work and therefore sufficient facts from which to infer the existence of an agency relationship. *Id.* at ¶ 51.

¶ 53    In contrast, in the present case there is no evidence of any conduct, oversight, ratification or authorization of Dr. Wilcox's practice of medicine either at his practice or at the hospital. Advocate did not supply Dr. Wilcox with any information concerning Antonio and did not request any of his records. Advocate did not make any recommendations as to Antonio's care and did not collect any overhead. Accordingly, *Lawlor* is inapposite.

¶ 54                                B. Apparent Agency

¶ 55    In the alternative, the plaintiff contends that the trial court erred when it found that there was no genuine issue of material fact as to whether there was apparent authority between Advocate and Dr. Wilcox. The plaintiff argues that the mere fact that the trial court reversed itself on this issue indicates the presence of a factual issue. More importantly, the plaintiff points out that Antonio's treatment by Dr. Wilcox was entirely predicated on his selection of Advocate GS Hospital as his medical provider, and his ability to choose Dr. Wilcox from a list of physicians in that Advocate hospital network. The plaintiff argues that he directly relied on Advocate to provide him with "great" physicians and "excellent health care" based upon Advocate's own advertisements promoting such services and physicians that were sent to his home and which he and his wife repeatedly saw in magazines and on television in their community. In addition, the plaintiff argues that Dr. Wilcox's website was ablaze with references to Advocate and Advocate's logo and that Advocate itself provided Dr. Wilcox practicing privileges at the hospital, as well as an ID badge to be worn there. Under this record, the plaintiff points out that

there can be no doubt that there remained genuine issues of material fact as to whether Advocate held out Dr. Wilcox as having authority to act on its behalf, or, in the alternative, whether it knowingly permitted Dr. Wilcox to assume such authority, upon which the plaintiff reasonably relied to his own detriment. For the reasons that follow, we agree.

¶ 56    Apparent authority, or ostensible authority, has been part of Illinois jurisprudence for more than 140 years. *Petrovich*, 188 Ill. 2d at 31 (citing Ill. L. & Prac. *Agency* § 112, at 734 (1953)). Under this doctrine, a principal is not only be bound by the authority which it actually gives to another, but also "by the authority that [it] appears to give." *Gilbert*, 156 Ill. 2d at 523. The doctrine functions like an estoppel. *Id*. Where the principal creates the appearance of authority, it will not be heard to deny the existence of the agency to the prejudice of an innocent third party who has been led to reasonably rely on it and is harmed as a result. *Harris*, 2019 IL App (1st) 180160, ¶ 17.

¶ 57    Our supreme court first applied the apparent authority doctrine in the medical malpractice context in *Gilbert*, 156 Ill. 2d 511. In that case, a patient suffered a heart attack after being treated and released by a physician at a hospital emergency room. After the patient died, his estate brought suit against the hospital, seeking to hold it vicariously liable for the physician's negligence in failing to diagnose the patient's heart problems. *Id*. at 517. The trial court awarded summary judgment to the hospital, holding that it could not be held vicariously liable because the emergency room physician was an independent contractor. *Id*. at 516-17. Our supreme court reversed, finding that an issue of fact existed as to whether the physician was acting as the hospital's apparent agent. *Id*. at 517.

¶ 58    The *Gilbert* decision was based on "two realities of modern hospital care." *Id*. at 520. First,

the court noted that hospitals have become "'big business' competing with each other for health care dollars." (Internal citations omitted.) *Id*. The court pointed out that through expensive advertising campaigns hospitals increasingly hold themselves out to the public as providers of quality health care and benefit financially from the health care delivered in their emergency rooms. *Id*. As the court explained:

> "Modern hospitals have spent billions of dollars marketing themselves, nurturing the image with the consuming public that they are full-care modern health facilities. All of these expenditures have but one purpose: to persuade those in need of medical services to obtain those services at a specific hospital." *Id*.

Second, according to *Gilbert* the reasonable expectations of the public have changed, and patients have come to rely on the reputation of the hospital in seeking out emergency care. *Id*. at 521. The court noted that it was natural for such patients to assume (correctly or not) that emergency room physicians are hospital employees, absent some manner of notice of their independent status. *Id*. at 521. The court stated that "[s]uch appearances speak much louder than the words of whatever private contractual arrangements the physicians and the hospital may have entered into, unbeknownst to the public, in an attempt to insulate the hospital from liability for the negligence, of any of the physicians." (Internal quotation marks omitted). *Id*.

¶ 59 With these "modern realities" in mind, *Gilbert* held that a hospital may be vicariously liable under the doctrine of apparent authority for the negligent acts of a physician, regardless of whether the physician was an independent contractor, unless the patient knew or should have known of the physician's independent status. *Id*. at 524.

¶ 60 *Gilbert* then set forth three elements necessary to show a hospital liable under the doctrine of

21

apparent authority: (1) the hospital, or its agent, acted in a manner that would lead a reasonable person to conclude that the individual who was alleged to be negligent was an employee or agent of the hospital; (2) where the acts of the agent create the appearance of authority, the plaintiff must also prove that the hospital had knowledge of and acquiesced in them; and (3) the plaintiff acted in reliance upon the conduct of the hospital or its agent, consistent with ordinary care and prudence. *Id*. at 525.

¶ 61     Subsequent to *Gilbert*, in *Petrovich*, our supreme court found that just like a hospital, a health maintenance organization (HMO) could be held vicariously liable for the negligence of its independent contractors under an apparent agency theory. *Petrovich*, 122 Ill. 2d 31-42. In that case, the plaintiff brought a medical malpractice action against a physician and others for their alleged negligence in failing to diagnose her cancer in a timely manner. *Id.* at 22. The plaintiff was a member of an HMO, which she named as a defendant. *Id*. She alleged that the HMO was vicariously liable for the conduct of the participating physicians who treated her. *Id*. at 25. The trial court granted summary judgment to the HMO, holding that it could not be held vicariously liable for the negligence of its physicians because they were independent contractors. *Id* at 22. Our supreme court reversed, holding that under its previous rationale in *Gilbert*, the HMO could be held vicariously liable under the doctrine of apparent authority. *Id*.

¶ 62     In coming to this conclusion, the court found that the plaintiff had met the "holding out" element of apparent agency because she had shown the following: (1) at the time she received her treatment she believed that her physicians were employees of the HMO; (2) the HMO handbook, which the plaintiff as an HMO member received, stated that the HMO would provide "all of your healthcare needs," and "comprehensive high quality services," and contained no provision identifying the HMO physicians as independent contractors; and (3) the plaintiff relied

on the information in this handbook in believing that her treating physicians were employees of the HMO. *Id*. at 37.

¶ 63    The court further found that the plaintiff had established her "justifiable reliance" on the representations of the HMO as the provider of care, because the "HMO restricts its members to the HMO's chosen physicians." *Id*. at 39. Agreeing with its prior rationale in *Gilbert*, the court explained that in establishing "justifiable reliance" the critical distinction is whether the plaintiff sought care form the health care entity or from a personal physician. *Id*. at 40. The court found that "where a person has no choice but to enroll with a single HMO and does not rely upon a specific physician, then that person is *** relying upon the HMO to provide health care." *Id* at 39. The court pointed out that the plaintiff had no choice of health plans because the HMO was selected by her employer and that once she became a member of that health plan, the HMO required her to obtain her primary medical care form one of its primary care physicians. *Id*. In accordance with this requirement, the plaintiff selected one of those physicians as her family practitioner, even though she had no prior relationship with him. *Id*. In turn, her family practitioner, who was required to make referrals only to physicians approved by the HMO, referred her to a specialist. The court held that these facts were sufficient or raise the reasonable inference that the plaintiff had relied upon the HMO to provide her health care services, and that the HMO could therefore be held vicariously liable for the negligence of both the family practitioner and the specialist. *Id*. at 39-40. As the court explained:

> "Were we to conclude that plaintiff was not relying upon [the HMO] for health care, we would be denying the true nature of the relationship among plaintiff, her HMO and the physicians. [The defendant HMO], like many HMOs, contracted with plaintiff's employer to become plaintiff's sole provider of health care, to the exclusion of all other providers. [The

23

HMO] then restricted the plaintiff to its chosen physicians. Under these fact, plaintiff's reliance on [the HMO] as the provider of the health care is shown not only to be compelling, but literally compelled. Plaintiff's reliance upon [the HMO] was inherent in [the HMO's] method of operation." *Id.* at 40.

¶ 64   Since *Petrovich* our supreme court has twice reaffirmed its holding in *Gilbert* and continues to adhere to its principles today. See *York*, 222 Ill. 2d at 195; and *Yarborough*, 2017 IL 121367, ¶¶ 37-38.

¶ 65   Applying these principles to the evidence before us, and construing it as we must in the light most favorable to the plaintiff, we find that there remain genuine issues of material fact as to whether there was an apparent agency relationship between Dr. Wilcox and Advocate, which is best resolved by a jury. The record before us reveals that through its substantial promotional campaign, Advocate held itself out in the community as a provider of "great doctors" and "excellence" in the health care it offered to its patients, and that the plaintiff and her husband directly relied on this advertising campaign and Advocate's reputation in the community in selecting Advocate GS Hospital as their health care provider. In this respect, the plaintiff testified that she and her husband received numerous mailings from Advocate at their home advertising the quality of Advocate's physicians and health care. They also saw many similar Advocate commercials on television and in magazines and newspapers in the community. The plaintiff unambiguously testified that, aside from her own prior positive experience at Advocate, she and her husband "absolutely relied" on these mailings and advertisements promoting Advocate GS Hospital's great physicians and excellent health care in deciding to continue receiving their health care from Advocate.

¶ 66   The plaintiff further explained that as a result, when through her employer's HMO she was

asked to select a medical group affiliated with a hospital, she deliberately chose Advocate GS Hospital and was correspondingly assigned the only Advocate GS Hospital HMO group-- Advocate GS 331 medical group. Since then, her medical insurance card identified her medical provider as "BlueCross/BlueShield HMO *** 331 Advocate GD SHEP." The plaintiff explained that within this Advocate HMO group, she was limited to about five physicians from which she could choose, all of whom had either "Advocate GS" or "Advocate" listed next to their names. Together with her husband, from this list, the plaintiff chose Dr. Wilcox after she looked up his personal website and found at the top a large "Advocate Healthcare" banner, as well as a notation in his biography affirming his affiliation with Advocate GS Hospital. The plaintiff further averred that it was her understanding that Dr. Wilcox, just as all of the other physicians on the list she obtained from Advocate GS 331 medical group, was "an employee" of Advocate GS Hospital. She explained that the only reason Antonio and she chose Dr. Wilcox was because they believed that he was an employee of Advocate GS Hospital and they had decided that this was the institution from which they wanted to receive their medical care. She affirmatively stated that she trusted Advocate GS Hospital and relied on it to provide Antonio with a physician. Under this record, we cannot state that all reasonable minds would agree that the relationship between Dr. Wilcox and Advocate was so tenuous that there was no evidence of "holding out" or "justifiable reliance," so as to deny any apparent agency. Accordingly, we hold that the trial court got it right the first time when it denied Advocate's motion for summary judgment on the basis of apparent authority. See, *e.g.*, *Malanowski*, 293 Ill. App. 3d at 725-28 (holding that where a university's conduct led a patient at an outpatient clinic to rely for treatment on the university rather than on any particular physician, the patient could maintain a medical malpractice action against the university on the theory of apparent agency, even though

25

the physicians maintained private practices at the clinic, and the patient had a prior and ongoing patient-doctor relationship with the physician against whom she alleged the malpractice).

¶ 67      In coming to this decision, we find that the public policy concerns that drove our supreme court's decisions in *Gilbert* and *Petrovich* are even more apparent here.  As our supreme court most recently recognized in *Yarborough*:

> "Our health care system has continued to evolve in the years since we decided *Gilbert.* The realities of modern hospital care that informed our decision then are even more true today. Hospitals across the country have consolidated to improve their finances in the health care industry and to attract more patients. [Citations].  Others have entered into 'rebranding initiatives' which have allowed more than one organization to use similar logos while continuing to retain their individual names. [Citation.]."  *Yarborough*, 2017 IL 121367, ¶ 40.

Our supreme court further acknowledged that these changes in the health care industry mean that "many hospital networks" own and operate numerous facilities outside of the main hospital campus, including small clinics in various neighborhood locations, and that therefore, "depending on the circumstances" a plaintiff could argue apparent agency against such a hospital network arising out of the treatment "at one of those facilities." *Id*. at ¶ 41.  In the present case, Advocate is at the heart of just such a hospital network.

¶ 68      Advocate nonetheless argues that despite our supreme court's statements regarding the applicability of the apparent agency doctrine to hospital networks, in *Yarborough* the court ultimately held that the hospital network in that case could not be held vicariously liable for the acts of the employees of an unrelated, independent clinic.  *Yarborough* 2019 IL App (1st) 180160, ¶ 1.  Advocate maintains that the facts in *Yarborough* are analogous to the facts in this

case and that accordingly we must find that Dr. Wilcox was not an apparent agent of Advocate. *Id.* at ¶ 1. We disagree and find *Yarborough* distinguishable.

¶ 69     In *Yarborough*, the plaintiff received prenatal care at the Erie Family Health Center (Erie) after she searched online and found a clinic that would administer a pregnancy test without requiring her to have insurance coverage. *Id*. at ¶ 3. After receiving a positive pregnancy result during her initial visit at Erie, the plaintiff was informed by staff members that she would likely deliver her baby at Northwestern Memorial Hospital (NMH) and was given information materials about NMH's facilities and services. *Id*. at ¶ 6. As a result, the plaintiff incorrectly believed Erie and NMH to be the same entity. *Id*. After delivering her baby prematurely, the plaintiff brought a medical negligence suit against NMH, alleging that Erie's employees, as the apparent agents of NMH, were negligent in providing prenatal care. *Id*. at ¶ 11. NMH moved for summary judgment on grounds that it neither owned not operated Erie, but that motion was denied by the trial court. *Id*. Upon NMH's motion, the trial court subsequently certified the following question to our supreme court: "Can a hospital be held vicariously liable under the doctrine of apparent agency set forth in [*Gilbert*] and its progeny for acts of the employees of an unrelated independent clinic that is not a party to the present litigation?" *Id*. at ¶ 1.

¶ 70     Our supreme court answered this question in the negative finding that the plaintiff's situation did not implicate the policy considerations that informed *Gilbert* and *Petrovich*. *Id*. at ¶ 43. The court found that the specific circumstances of that case were in "marked contrast to the factual backdrop" that led it to extend the doctrine of apparent authority in *Gilbert* and its progeny. *Id*. at ¶ 44. Specifically, the court found:

>     "Erie is neither owned nor operated by NMH. While Erie receives some charitable financial and technical assistance from NMH, Erie is a F[ederally] Q[ualified] H[ealth]

C[enter] that relies heavily on federal grants and Medicaid reimbursements to provide underserved communities with primary and preventative care regardless of an individuals' ability to pay. Eire's employees are considered federal employees, and suits against Erie or its employees can only be maintained under the Federal Torts Claim Act. Erie does not utilize the Northwestern name. There is no Northwestern-related branding or the use of Northwester's trademark purple color by Erie." *Id*. at 44.

Under these facts the court concluded that NMH could not be held vicariously liable for the care given by Erie's employees. *Id*. at 47.

¶ 71     *Yarborough* is clearly distinguishable from the instant facts. Unlike *Yarborough*, where Erie was not a defendant in the case, here Dr. Wilcox is a named defendant in the underlying malpractice action. In addition, in *Yarborough* the plaintiff sought treatment at Erie to avoid having to use insurance, and not because she believed that Erie was an affiliate of NMH or because she had relied on NMH's reputation in the community or its advertisements regarding its excellent health care, and therefore wanted to be treated there. In contrast, in the present case, the plaintiff's treatment by Dr. Wilcox was directly related to her choice of Advocate as her primary healthcare provider as dictated by her HMO and premised on Advocate's widespread promotional campaign. Moreover, unlike in *Yarborough*, where Erie presented absolutely no indicia of a relationship to Northwestern, Dr. Wilcox was surrounded by Advocate insignia, from the logo on his website, to the letter welcoming new clients to the Advocate GS Physician's group. Accordingly, we find *Yarborough* inapplicable.

¶ 72     We similarly reject Advocate's contention that it cannot be held vicariously liable for Dr. Wilcox's negligence because his entire treatment of Antonio occurred outside of Advocate GS Hospital and not in any other facility owned by Advocate. Contrary to Advocate's position, our

supreme court has never held that apparent authority principles apply strictly to treatment that occurs within the confines of a hospital or a treatment center owned by a hospital. In fact, in *Yarborough* our supreme court explicitly rejected this argument, citing to *Petrovich* and stating that "this court has already applied the rationale of *Gilbert* outside of treatment received at a hospital or facility owned by a hospital." Id. at 42. As we have aptly explained in the past:

> "[W]e [can] discern nothing in the *Gilbert* opinion, which would bar a plaintiff who could otherwise satisfy the elements for a claim based on apparent agency from recovering against a hospital merely because the negligent conduct of the physician did not occur in the emergency room or some other area within the four walls of the hospital. If *** [the health care entity's] conduct reasonably led [plaintiff] to rely upon [it] for treatment, rather than any particular physician then plaintiff should be allowed recovery for damages caused thereby." *Malanowski*, 293 Ill. App. 3d at 727

¶ 73    Advocate finally argues that there is no apparent agency here because Antonio relied on Dr. Wilcox for his treatment, rather than on Advocate GS Hospital. Contrary to this position, the record reveals that the plaintiff explicitly testified that she and Antonio relied on Advocate GS Hospital to be their healthcare provider and that they chose their HMO medical group based on Advocate's reputation. Dr. Wilcox was just one of the few physicians available to them through the Advocate GS Hospital HMO medical group, and he himself was selected only after they reviewed his website and confirmed his apparent affiliation with Advocate. Accordingly, Antonio and Jennifer relied on Advocate and not on Dr. Wilcox alone.

¶ 74                                    III. CONCLUSION

¶ 75    For the aforementioned reasons, we affirm the trial court's grant of summary judgment in

favor of Advocate on actual agency grounds but reverse its judgment on the issue of apparent agency and remand for further proceeding before the trial court.

¶ 76    Affirmed in part; reversed in part.